**STATE of Minnesota, Respondent,**

v.

**Brian Keith HOOPER, Appellant.**

No. C2–99–188.

Supreme Court of Minnesota.

Dec. 28, 2000.

Rehearing Denied Feb. 6, 2001.

Jeffrey Dean, Special Assistant State Public Defender, Minneapolis, for appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, Amy Klobuchar, Hennepin County Attorney, Patrick C. Diamond, Assistant County Attorney, Minneapolis, for respondent.

John M. Stuart, Minnesota State Public Defender, Minneapolis, observer for respondent.

## OPINION

STRINGER, Justice.

When the decomposed body of Ann Prazniak was found in a cardboard box in a closet of her apartment at 1818 Park Avenue South on April 15, 1998, a criminal investigation soon led the police to suspect appellant Brian Keith Hooper. Appellant was indicted on three counts of first-degree murder[1] and was convicted and sentenced on each charge. His direct appeal raising issues of exclusion and sufficiency of evidence was stayed and remanded to the trial court on his petition for retrial based upon newly discovered evidence. The trial court denied his motion and on appeal here we review the claims he raised in his direct appeal and his claim that he was entitled to a new trial based upon newly discovered evidence. We affirm.

Ann Prazniak, a 77–year–old resident of 1818 Park Ave. South in Minneapolis, was last seen at her bank in late March, 1998 when she reported her checkbook missing. In early April of 1998 Prazniak's neighbors contacted the police and her apartment manager, fearful that her apartment had been taken over by drug dealers. Prazn-

1. Appellant was indicted on counts of premeditated murder, murder with burglary, and murder with kidnapping under Minn.Stat. § 609.185, subds. 1, 3 (2000).

iak, who usually paid her rent promptly, had not paid the April rent on her apartment.

On April 3 the apartment manager entered Prazniak's apartment to look for her and three days later police searched the apartment. It was in disarray and filled with debris, rotting food and cat feces, but there was no sign of Prazniak. Police saw evidence of drug dealing in the living room, including chopped up bath soap, commonly sold as fake crack, on a coffee table, and torn plastic baggies, typically used to wrap crack cocaine for sale, on the floor. Police called Animal Control to care for a cat found in the apartment and told the apartment caretaker to change the locks.

On April 10 police again searched the apartment and found its condition much the same. On both visits police saw a box inside the bedroom closet with cloth or clothing on top but did not look inside. On the first visit the apartment generally smelled unpleasant, but on the second visit police smelled a noticeable foul odor.

The police returned to Prazniak's apartment for a third time on April 15. Upon stepping out of the squad car the police noticed a "rotten" odor. The police and building owner determined that the smell came from Prazniak's apartment and upon stepping inside they determined the source of the smell was the bedroom closet. Inside the closet police found a cardboard box containing a heavy cloth and plastic bundle. Upon cutting into the bundle police discovered human remains. The medical examiner was then called and later testified the remains in the box were those of Ann Prazniak. Prazniak's body was wedged upside down in a fetal position and a string of Christmas tree lights was wrapped around the box, apparently to reinforce it. Prazniak's body was wrapped in a mattress pad and two large black/ green garbage bags. Underneath the bedding and garbage bags Prazniak's head and body were wrapped in a blanket and secured with rope and her wrists were tightly bound with packaging tape. Electrical cord was tied around her ankles, and her nose and mouth were covered by layers of packaging tape wrapped around her face. Prazniak was determined to have suffered a broken rib and bruises to her wrists and knees before her death.

The medical examiner testified that the cause of death was asphyxiation caused by the layers of packaging tape covering her mouth and nose, a broken rib that put pressure on her chest, and the upside down and tightly curled position of her body, which would have prevented her diaphragm from expanding. Although the date of her death could not be established precisely, the medical examiner estimated Prazniak died two weeks to a month before the discovery of her body by police. Prazniak was five feet and one inch tall and weighed less than 100 pounds at the time of her death.

Neighbors told police investigators that they had seen people coming in and out of Prazniak's apartment including a woman named "Shay" and a man named "Brome." The police determined "Shay" to be Chalaka Lewis and "Brome" to be appellant. Police found Lewis' fingerprints on pieces of brown packaging tape stuck to the floor of the apartment similar to tape removed from the victim's body. Appellant's fingerprints were found on two sandwich baggies and a beer can in the living room. The fingerprints of Vonda Quass, a witness who confessed to smoking crack in the apartment, were found on a dark black/ green garbage bag similar to the ones used to wrap the body, and were also found on a white garbage bag. Several other prints were recovered, but none could be identified.

In an interview with police appellant said the only time he had ever met Prazniak was when he helped her take out her garbage. He described her as a "nice little old lady." Appellant claimed that he first went to her apartment with Lewis and Lewis told him she was watching

Prazniak's cat because Prazniak was in treatment for alcohol abuse. Appellant said he noticed a foul smell in the apartment but attributed the odor to waste from the cat. Appellant admitted entering Prazniak's apartment three different times to smoke crack cocaine and have sex but denied killing Prazniak.

Police interviewed Lewis four times over the course of a month. At first Lewis denied any knowledge of the murder, but in the fourth interview Lewis gave a detailed statement incriminating appellant. Lewis testified that on the night of the murder she was at 1818 Park smoking crack cocaine in the hallway and she saw appellant standing near Prazniak's apartment with a woman named Tammy and two other people she did not know. Police never found a witness named Tammy.

Not wanting to share her drugs with the others, Lewis went to a different part of the building to smoke. When she returned she hoped that appellant and the others would share their crack cocaine with her. She saw appellant standing alone in the door of Prazniak's apartment and entered the apartment when appellant offered her crack to be a lookout for him. Once inside, appellant went to a back room of the apartment and shut the door while Lewis watched the hallway of the apartment building. Lewis saw a cat crying at the bedroom door and thought she heard a woman's voice say "Help." Lewis became afraid and left the apartment building, but appellant followed her outside and called her back.

Lewis went back to the apartment with appellant and again watched out the door to the hallway while appellant went to the bedroom. A few minutes later appellant came out sweating and "his eyes was looking all wild, * * * and he was cussing and swearing." Appellant looked through the drawers of a desk in the dining room, pulled out some rolls of beige packaging tape and told Lewis to tear off tape for him. Lewis tore strips of tape and threw

them on the floor. Appellant took the tape strips to the bedroom and Lewis heard "some rumbling or some bumping noises." Lewis was frightened, left the apartment and paced in the hallway. Appellant opened Prazniak's door, asked Lewis, who was pregnant at the time, what she was doing and threatened to kick her in the stomach to make her lose the baby if she didn't keep watch. At the time Lewis was five and a half months pregnant, five feet five inches tall, and weighed about 140 pounds. Appellant then went down the hallway to purchase some crack, gave it to Lewis and demanded she smoke in Prazniak's apartment. Lewis complied.

After Lewis smoked the crack, appellant offered her more drugs if she straightened up the living room so he could sell drugs out of the apartment. He gave Lewis garbage bags and she picked up trash in the front rooms. Lewis and appellant then went to the street corner where appellant bought more crack. Lewis testified she told appellant that she didn't want to go back to the apartment but appellant responded "don't make me hurt you." When she returned with him he offered her two bags of crack if she straightened up the back room. Lewis testified she was afraid to go in the back room because the cat was at the door crying and she thought appellant had done something to Tammy.

The bedroom was empty when Lewis went in to clean and she was relieved, assuming that whoever had been back there must have escaped. She filled a garbage bag with Christmas lights, string, glass, chain links, newspaper and cardboard. Lewis testified that she tried to open the bedroom closet but could not because a knife was wedged between the door and the doorjamb. Appellant told her to leave the door alone,[2] and she and appellant then put the bags of trash in the hallway and left the building. Once outside, appellant threatened to kill Lewis if she told anyone what happened and in-

---

2. Police investigators later found a knife in the closet.

structed her that if anyone asked she should say she went to the apartment with Tammy. Lewis testified that she returned to Prazniak's apartment about a week later and bought crack, and subsequently returned again to look for something to steal and to smoke crack. In her statement to police, Lewis admitted that she told others to say "the old lady is out of town."

Four witnesses testified at trial that appellant admitted killing Prazniak. Calvin King testified that he and appellant bought narcotics together at an apartment at 1818 Park Avenue South on April 9, 1998. Appellant suggested that they get high in a place upstairs at 1818 Park, but they went to King's house instead. After getting high appellant said he was glad they did not go to the place he had suggested "because it stink." Appellant then told King, "Man, I did some fucked up shit * * * I had to kill the motherfucker * * * Me and my girl * * * For real. A old bitch on top of it." King saw appellant again at the Hennepin County Jail between April 20 and May 4, 1998. Appellant told King he was being held for a burglary connected to the crime he had told King about previously-appellant was in fact being held for burglary of Prazniak's apartment.

Lolita Fairley testified that on April 18th or 19th of 1998 she and appellant went to a house to use drugs together. Fairley testified that before getting high appellant asked her if she had heard about the killing on 18th and Park and that appellant told Fairley that he "accidentally killed her," but appellant did not identify the person he referred to as "her." Fairley testified that at first she told police appellant said he killed Prazniak while Prazniak's apartment was full of people getting high. Fairley also admitted that during police questioning she accused appellant of killing another person.

Cardnel Brown and Lucas James testified that they talked with appellant on separate occasions at the Hennepin County Workhouse during May of 1998 while being held there. Brown testified appellant said he was selling drugs and prostitutes out of Prazniak's apartment. According to Brown, appellant said he was roaming the hallway with a "female associate" at 1818 Park when a lady came out to see what was going on and that he pushed the lady in the face, knocking her unconscious. The female associate sat down to get high and they discussed what to do with the lady. Brown testified appellant told him he wrapped the victim in bedding and plastic, put her in a box and put her in the closet.

James testified appellant admitted being involved in "Annie's" murder, that appellant said Prazniak told him to leave the apartment because appellant was not giving Prazniak money for using her home for prostitution, and that appellant said Prazniak pushed appellant toward the door causing appellant to "snap" and start "swinging on her." James further testified appellant told him that he had killed her but said nothing about others being present during this confrontation.

Brown, King and James testified they had heard coverage of the murder in the media prior to testifying. Three of the witnesses Fairley, King, and James testified they did not know one another. Brown did not testify whether he knew the others, but James did know Lewis. Fairley did not receive anything from police in exchange for her testimony. Brown testified that he received thirty dollars from a police officer but it was not in exchange for his testimony. In exchange for King's testimony the prosecutor told King he would assist him in getting credit for time served on an unrelated offense. In exchange for his testimony, James received a shorter-than-guidelines sentence for an unrelated offense.

Vonda Quass, a witness who had admitted smoking crack in Prazniak's apartment, asserted her fifth amendment right not to testify at appellant's trial. The defense offered a videotape of a police interview with Quass in which she said she

had a conversation with a resident of 1818 Park about the foul smell pervading the building, and she and the resident decided Ann Prazniak was dead in her apartment and considered calling 911 to report the smell. Later in the interview police asked why Quass did not call 911, saying "You just told us that you thought she was dead in there." Quass responded, "That was two weeks after she died!" When questioned how Quass knew when Prazniak died, Quass said "the whole building knew." The trial court upheld the state's objections to admission of the videotape in evidence on the grounds that it was irrelevant hearsay.

A jury convicted appellant of three counts of first degree murder and he was sentenced to three concurrent life sentences. He appealed seeking reversal and a new trial, arguing that the trial court erroneously excluded the videotape evidence implicating a third party in the murder, that the conviction was based on uncorroborated accomplice testimony, and that it lacked sufficient evidence. Shortly before oral argument was to be heard before this court, appellant filed an emergency motion to remand to the trial court based on newly discovered evidence. We stayed appellant's appeal and remanded for postconviction proceedings. The district court held a postconviction evidentiary hearing, heard oral argument on appellant's postconviction motion and denied appellant's motion for a new trial. Appellant's motion to reinstate his appeal was granted and appellant now reasserts all issues raised on direct appeal and further asserts that the evidence is insufficient to sustain the postconviction court's denial of a new trial.

At the postconviction evidentiary hearing, Christopher Genosky, a witness who came forward after trial, testified that he spoke to his father around April 1 of 1998, and his father told him Quass had called. Quass was Genosky's former girlfriend and the mother of his child. Genosky called the number his father gave him, and when he spoke to Quass she was "emotional * * * she kind of swings from laughing to hysterical * * * that's how she normally is when she's on crack." Quass told Genosky she wanted a ride to Waukesha, Wisconsin. Genosky testified that "when I kept saying no, she had finally said that her and her friend Shay needed a ride because they had hurt a lady and needed to get out of town." At the time Genosky thought Quass was lying to manipulate him into doing her a favor.

Genosky moved from Wisconsin to Minnesota in October of 1998, around the time of appellant's trial, and testified that he did not hear of the Ann Prazniak case until reading about it in the newspaper in October of 1999. Genosky signed an affidavit prepared by appellant's attorney in which he stated that Quass told him she and Shay hurt a lady in an apartment building, but Genosky testified he was not sure whether Quass mentioned an apartment building during their conversation. The state demonstrated Genosky was unsure of many additional details regarding his contact with Quass, including details of his alleged contact with his father. Phone records show no calls to Genosky from his father between March 22 and April 12, 1998 but they did show a call from Genosky to his father on March 29, 1998. Genosky testified his long distance bill did not reflect the call to Quass because he used a prepaid calling card.

The state impeached Genosky with evidence that in the fall of 1998 Genosky falsely accused the manager at his place of employment of sexual harassment because he wanted to be promoted to the manager's job. When confronted with a copy of a written notice of disciplinary action summarizing the false accusation incident, Genosky maintained that he had never seen the notice, that he had never admitted making false accusations of sexual harassment and that although the signature at the bottom looked like his own, someone must have forged it. The investigator of the reported sexual harassment incident

testified that Genosky admitted bringing the false allegations of sexual harassment and that he signed the written notice of disciplinary action in her presence. She also testified that in her opinion Genosky is not a truthful person and that he had a reputation for dishonesty at his former workplace. Genosky's father acknowledged on the stand that he told police his son tells the truth only about half the time but said he was referring to when Genosky was young. The state introduced evidence of three prior burglary convictions.

## I.

■ Appellant first asserts that because the videotape of the interview of Quass tends to show Quass knew the date of Prazniak's death and only the murderer or an accomplice would know it, the trial court erred in excluding it from evidence when it ruled that Quass' exclamation "That was two weeks after she died!" was inadmissable hearsay because it was not a statement against interest. We accord broad discretion to the trial court in evidentiary rulings and will not reverse absent a clear abuse of discretion. *See State v. Flores*, 595 N.W.2d 860, 865 (Minn. 1999).

■ Under the statement against interest hearsay exception, a statement made by an unavailable declarant[3] is not excluded by the hearsay rule if it

was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances

clearly indicate the trustworthiness of the statement.

Minn.R.Evid. 804(b)(3) (1998). Whether "a reasonable person in the declarant's position would not have made the statement unless believing it to be true" is determined in light of the surrounding circumstances. *See Williamson v. United States*, 512 U.S. 594, 603–04, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

■ In *State v. Ashby* this court held that a statement by a third party was not against interest where "there was no explicit confession and no actual acceptance of responsibility. Moreover, it was not clear from the statement itself *what* [declarant] was taking responsibility for there was no mention of the murder at all." 567 N.W.2d 21, 26 (Minn.1997) (emphasis in original). In addition, "[b]ecause hearsay statements tending to exculpate the accused must be regarded with suspicion, * * * to be admissible, declarations against penal interest must be proven trustworthy by independent corroborating evidence that bespeaks reliability." *State v. Higginbotham*, 298 Minn. 1, 5, 212 N.W.2d 881, 883 (1973).

■ Quass did not admit to personal knowledge regarding Prazniak's death or her murder in the videotaped interview conducted more than two weeks after police discovered Prazniak's body. She referred to the smell in the hallways and a comment made to her by the "girl that lives next door to Lindsay," but made no reference to timeframe, crime committed, or knowledge of any details of the crime. Importantly, she denied any involvement in the murder.

■ Evidence tending to show that another person committed the crime charged to the defendant is relevant to whether the defendant in fact killed the deceased, *see State v. Hawkins*, 260

---

**3.** There is no dispute that Quass was unavailable; she invoked her Fifth Amendment right not to testify.

N.W.2d 150, 158 (Minn.1977), but the statements made by Quass are so ambiguous and their probative value is so low that they cannot reasonably be considered to show that someone other than the defendant committed the crime. In light of the evidence that concerned neighbors contacted the police and Prazniak's landlord nine days before the body was found, and four witnesses testified that appellant admitted killing Prazniak, it would not be unreasonable to conclude that Quass was repeating rumors rather than implicating herself in the murder. We conclude that the trial court did not abuse its discretion in ruling that Quass' interview was irrelevant and not a statement against interest.

## II.

■ Next, appellant argues that his conviction violates Minn.Stat. § 634.04 (2000) because his conviction was based on the uncorroborated testimony of an accomplice.[4] We review the evidence in the light most favorable to the state and resolve all conflicts in the evidence in favor of the verdict. *See State v. Bergeron*, 452 N.W.2d 918, 924 (Minn.1990).

■ Corroborative evidence supporting the testimony of an accomplice must be "weighty enough to restore confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial way." *State v. Norris*, 428 N.W.2d 61, 66–67 (Minn.1988). "Corroborating evidence may be secured from * * * the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed." *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980).

■ Assuming that Lewis was an accomplice, much of the evidence presented at trial corroborated her testimony. Appellant's admission to police that he was in Prazniak's apartment was confirmed by

fingerprint evidence, and physical evidence of drug dealing in the apartment provided a possible motive for the killing. Lewis' testimony that she handled packaging tape was confirmed by her fingerprints on pieces of packaging tape found in the apartment and Prazniak's body was found wrapped in similar packaging tape. Neighbors had seen Lewis and appellant at the apartment and four independent witnesses testified that appellant admitted killing Prazniak. Lewis testified that a knife stuck in the door of Prazniak's bedroom closet prevented her from opening the door and police later discovered a steak knife in the closet where Prazniak's body was found. Lewis testified that she cleaned up tape, Christmas lights, and other debris from Prazniak's bedroom and saw a box like the one in which Prazniak was found these items were discovered with Prazniak's body.

Appellant's defense rested in part on his contention that Lewis was the killer or an accomplice and therefore had a motive to lie about appellant's role in the murder. In her statement to police and her testimony at trial, Lewis maintained that she never saw Prazniak either alive or dead. At trial, appellant argued that Lewis' knowledge of the details of the crime implicated her in the killing because the fact that Prazniak was wrapped in a blanket, bound with tape and electrical cord and that she suffered a fractured rib and bruising was withheld from the public. Lewis said to police, "I figured that he had her taped up tied up and had her mouth taped shut so that she couldn't talk and had her arms taped up." Lewis then held her wrists in front of her, in the same manner as Prazniak's wrists were bound. Lewis said she just assumed the victim's mouth was taped to keep her quiet and that her wrists were bound that way because she had seen it in the movies. A witness who admitted to

---

**4.** "A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Minn. Stat. § 634.04 (2000).

smoking crack in Prazniak's apartment told police that Lewis admitted accidentally killing Prazniak, but later said he made up the story. A cashed check from Ann Prazniak's account with Lewis' handwriting on it was recovered by police. The check was dated March 23, 1998, near the time the medical examiner determined Prazniak could have died. Lewis testified that in mid-March she got some checks from one of appellant's cousins while in the park, but she could not remember the name on the checks. Thus some evidence supported appellant's theory that Lewis was implicated in the murder.

Nonetheless, as to appellant's guilt, Lewis' testimony was corroborated by the greater weight of the physical evidence, witness testimony, and appellant's own admissions. Viewing the evidence in the light most favorable to the state, ample corroborating evidence was presented to the jury to support a finding that Lewis' testimony was reliable as to appellant's guilt. We hold appellant's conviction did not violate Minn.Stat. § 634.04 prohibiting a criminal conviction from resting on the uncorroborated testimony of an accomplice.

### III.

Appellant next asserts that the evidence was insufficient to support his conviction. When assessing the sufficiency of the evidence our inquiry is limited to whether, given the facts in the record and legitimate inferences drawn therefrom, a jury could reasonably conclude the defendant was guilty of the offense charged. See Ashby, 567 N.W.2d at 27. The reviewing court "must view the evidence in the light most favorable to the prosecution and assume the jury believed the prosecution's witnesses and disbelieved any contrary evidence." Id.

Appellant argues that because Lewis knew facts about the murder that were withheld from the public and James, King, Brown and Fairley gave differing accounts of who accompanied appellant into Prazniak's apartment, the evidence supports a finding that Lewis was the killer. A close review of the record indicates that King, Brown and Fairley all testified that appellant first entered the apartment with a woman and two others an account consistent with Lewis' testimony that she saw appellant with a woman shortly before he asked her to be his lookout. James testified that appellant never mentioned whether anyone was with him. In the end however, Lewis' knowledge of the crime may raise a suspicion that she was implicated, but it does not exonerate appellant.

Viewing the evidence in the light most favorable to the prosecution, a reasonable jury had ample evidence to convict appellant. We hold that there was sufficient evidence to support appellant's conviction.

### IV.

Finally, appellant asserts that the evidence at the postconviction hearing was insufficient as a matter of law to support the postconviction court's refusal to grant a new trial. The denial of a new trial by a postconviction court will not be disturbed absent an abuse of discretion and review is limited to whether there is sufficient evidence to sustain the postconviction court's findings. Scruggs v. State, 484 N.W.2d 21, 25 (Minn.1992).

Appellant's petition for postconviction relief challenges the ruling of the postconviction court that the alleged admission by Quass to Genosky that she and "Shay" had "hurt a lady" was not a statement against interest and was therefore inadmissible hearsay. As noted above, a statement is admissible under the hearsay exception if it "was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest * * * that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Minn.R.Evid. 804(b)(3). A statement that is so vague as to make it impossible to

determine what interest the declarant is jeopardizing does not qualify under the exception for a statement against interest. *See Ashby*, 567 N.W.2d at 26.

Genosky testified the alleged statement by Quass was made close in time to Prazniak's death and included the name "Shay." It was established at trial that Lewis' and Quass' fingerprints were found in Prazniak's apartment, that Lewis was known as "Shay," and that Lewis knew many details of the murder. The alleged statement did not include any information that would connect Quass with Prazniak's death. Quass didn't identify the victim or the crime committed or how, why, where or when she "hurt a lady." Her statement was too vague to determine what penal interest Quass was jeopardizing.

The circumstances surrounding the statement cast further doubt on the credibility of Quass' statement. Genosky testified that Quass made the admission while trying to induce Genosky to give her a ride, and Genosky indicated Quass typically lied to him when she wanted a favor. Genosky testified Quass sounded high on crack and was joking and laughing. Other evidence at trial showed that in any event, Quass returned to Prazniak's apartment to smoke crack rather than attempting to leave town.

▮ The postconviction court's determination that Quass' alleged statement was inadmissible hearsay is based on the statement's failure to meet the requirements of Minn.R.Evid. 804(b)(3) and the lack of independent corroborating evidence that might bolster its reliability. The inadmissibility of the newly discovered evidence, however, is not the only issue upon which the postconviction court denied appellant a new trial. A petitioner for a new trial on the basis of newly discovered evidence must show that "the evidence is material" and "will probably produce either acquittal or a more favorable result" for petitioner. *Woodruff v. State*, 608 N.W.2d 881, 888 (Minn.2000).

In holding that the newly discovered evidence presented by appellant was not material and would not produce a more favorable result, the postconviction court first observed that Genosky's reputation for truthfulness was substantially impeached. The court found that Genosky could not remember many of the details of the alleged conversation with Quass, the phone records were incomplete, he had lied for personal gain in the past, he had a poor reputation for truthfulness and he had demonstrated his willingness to lie on the stand when confronted with a notice of disciplinary action for making false accusations against a previous supervisor on an earlier occasion. The court also noted that Quass' alleged desire to leave town was not consistent with evidence presented at trial that Quass returned to Prazniak's apartment to smoke crack. Finally, even if Quass' alleged statement was believed, it would not impeach the evidence presented at trial relating to appellant's four confessions to independent witnesses, his own admission that he was in Prazniak's apartment, or Lewis' testimony pointing to appellant's guilt.

The postconviction court's denial of a new trial based on newly discovered evidence is supported by detailed findings and the court's ruling that Quass' statement that she "hurt a lady" was inadmissible hearsay due to the vagueness of the statement and the lack of corroborating evidence supporting its trustworthiness; that Genosky, appellant's only witness, was impeached, and that the newly discovered evidence proffered by appellant did not directly impeach evidence of appellant's guilt. If admitted, appellant's newly discovered evidence would at most support a theory that Lewis was an accomplice to the murder an assertion irrelevant to the issue of appellant's own guilt. We hold that the evidence supports the denial of a new trial by the postconviction court.

Affirmed.