**STATE of Minnesota, Respondent,**

v.

**Christopher David NELSON, Appellant.**

**No. C9–00–1412.**

Supreme Court of Minnesota.

Aug. 16, 2001.

John M. Stuart, Minnesota State Public Defender, Jodie L. Carlson, Assistant State Public Defender, Minneapolis, for appellant.

Mike Hatch, Minnesota Attorney General, John B. Galus, Assistant Attorney General, David S. Voigt, Assistant Attorney General, St. Paul, Gregory D. Larson, Hubbard County Attorney, Park Rapids, MN, for respondent.

## OPINION

STRINGER, Justice.

Gregory Johnson was last seen on November 11, 1996. His dismembered body was found the following April. Appellant Christopher David Nelson and Scott Carter were the last persons to see him alive. On November 20, 1997, appellant and Carter were indicted on charges of first- and second-degree murder in Johnson's death. Carter pled guilty to second-degree murder and testified against appellant at trial. Following a jury verdict of guilty, appellant was convicted of aiding and abetting

murder in the first and second degree[1] and sentenced to life in prison. Appellant challenges the sufficiency of the evidence supporting his conviction and argues that the trial court erroneously allowed the prosecution to present *Spreigl* evidence of his participation in two armed robberies. We affirm.

At the time of his death Gregory Johnson was 39 years old and lived alone. Appellant lived with Scott Carter and Carter's girlfriend, Pamela Rossbach in a trailer home in rural Hubbard County outside of Park Rapids, Minnesota, about 20 minutes from Johnson's home by car. Johnson worked as a bartender at Art's Place in Park Rapids and Carter was a regular patron of the bar. In the summer of 1996 appellant was employed at Art's Place for a brief period. Appellant, Carter, and Rossbach were evicted from their trailer home in October of 1996. Because a rental unit would not be ready until November, Johnson let them stay in his home. Johnson asked them to leave before the rental unit was ready however, and when they moved out, appellant, Carter, and Rossbach had to live in an unheated tent camper until a rental unit was available at the beginning of November.

On November 10 and 11, 1996, Rossbach's sister Paula came to the Park Rapids area to look for Rossbach. November 11 was Veteran's Day and Johnson had the day off work, so he helped Paula find her sister. Johnson told Paula of rumors that her sister was involved in a sexual threesome with appellant and Carter and further, that he planned to have Carter's inoperable pickup truck towed from his property unless it was removed by the next day. Carter did not own a working vehicle at that time, and often borrowed appellant's van. Appellant testified that he and Carter often borrowed one another's guns and tools and that he considered Carter to be a "companion and friend."

Paula spoke with her sister in the early afternoon of November 11, 1996 and communicated Johnson's sexual threesome comment and his threat to have Carter's truck towed. Paula testified that appellant and Carter became angry and made threatening comments about wanting to "take care" of Johnson. Rossbach attempted to calm them down, but when Paula left at about 2:15 p.m., both were still "smoldering ." Rossbach testified that appellant said something about beating Johnson. At trial, appellant and Carter both denied making threats.

Appellant, Carter, and Rossbach testified that after Paula left, they drove to Johnson's home to tow Carter's pickup truck. When they arrived, Johnson was drinking whiskey and they went into his home and drank beer. Johnson joined them in towing the pickup truck back to their trailer where they drank more beer. Appellant, Carter and Johnson then left in appellant's van to drive Johnson home.

Jennifer Hensel Dumont and Charlotte Wilson, friends of Johnson, became alarmed that evening and the next day because Johnson's telephone line was busy. They went to his home and found the curtains open and the lights on, but Johnson's horse had not been fed. They called Johnson's boss, who went in and found the telephone off the hook but the premises otherwise undisturbed. Dumont and Wilson then went to the home of appellant

---

1. Appellant was found guilty of aiding and abetting first- and second-degree murder as defined by Minn.Stat. §§ 609.185(1) (2000) and 609.19, subd. 1(1) (2000), respectively. "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1 (2000).

and Carter to ask whether they had seen Johnson. They testified that Carter and appellant did not ask them inside, appellant did most of the talking, and Carter looked at him for approval to speak. A police investigator also testified that appellant and Carter appeared to look at one another for confirmation when interviewed shortly after the disappearance.

In an interview at the police station on November 15, 1996, appellant related that Johnson had told him he had a crush on him and it was "seriously gross." Appellant told police there were no problems after he told Johnson he was straight, but appellant stated he had been angry about being asked to leave Johnson's home in October. Rossbach later testified that she and appellant were not angry about having to stay in the uncomfortable tent camper when Johnson told them to leave his home, but that Carter was upset about it.

Nothing suspicious was found in the police search of the trailer where appellant, Carter, and Rossbach were living, but a search of appellant's van approximately two weeks after Johnson's disappearance revealed that the rear of the van had been cleaned in contrast to the dirty condition of the rest of the van. A chemical test revealed traces of blood on the side moldings of the van, the back walls, and the carpet towards the rear hatch, but investigators were unable to obtain a sample for further analysis.

Months later, in April of 1997, a torso identified through genetic testing as Johnson's was found on a bank of the Crow Wing River south of Park Rapids. The head, hands and feet of the body had been amputated. At trial, the medical examiner testified that the only wounds to the torso were at the points of amputation, and the amputations appeared to have been done with a knife and an instrument similar to a splitting maul or axe after the victim's death. Test results showed that Johnson had been drinking prior to the time of his death.

Evidence of two other crimes was admitted as *Spreigl* evidence [2] in appellant's trial. In the early morning hours of June 22, 1997, appellant and Carter robbed a liquor store/bar in Hackensack, Minnesota. Two liquor store employees testified that they were getting ready to close for the night when a man matching appellant's description carrying a 9 mm. handgun came in the front door and a man matching Carter's description carrying a sawed-off shotgun came in the back door. The men ordered them into the bathroom and bound their hands with duct tape. Appellant watched the employees while Carter took money that was sitting in a bag next to the cash register. Appellant testified that Rossbach was in the van with a walkie-talkie watching the police scanner and that he and Carter both carried walkie-talkies to coordinate their entry into the building.

About two weeks later, on July 6, 1997, appellant and Carter robbed a Snappy Mart convenience store in Deming, New Mexico. A customer and a store clerk testified that a man matching appellant's description entered the Snappy Mart carrying a handgun. He ordered them to the storeroom and forced them to kneel. A man matching Carter's description came in with something silver in his hand that the witness thought could have been duct tape, taped the customers' hands together and ordered the clerk to open the cash register. Carter testified that Rossbach drove the van away from the Snappy Mart after

---

2. Evidence of other crimes committed by the defendant in a criminal proceeding is referred to in Minnesota as *Spreigl* evidence after our decision in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

the robbery. When police began following them, appellant began shooting. Rossbach and Carter surrendered, but appellant fled to their hotel room and barricaded himself for twelve hours. A police negotiator testified that during the standoff appellant stated Carter and Rossbach were "basically innocent," he had "dragged them into it," "[t]hey didn't really have much of a choice," and that appellant wanted to die because he feared spending the rest of his life in prison.

During his imprisonment in New Mexico for the Snappy Mart robbery, Carter contacted Minnesota police authorities and asked for the reward money that had been posted for information about the murder of Greg Johnson, claiming that appellant had told him about committing the murder. At first Carter denied witnessing the murder but later admitted he was present for the shooting and dismemberment.

Carter pled guilty to second degree murder and testified for the prosecution at appellant's trial. Carter testified that appellant and Johnson had an on-again off-again friendship, that appellant was "a little pissed" Johnson had asked them to leave his home in October before the rental unit was ready and that appellant was kind of angry about the threesome comment made by Johnson. Carter testified that when they left in appellant's van to take Johnson home after socializing on November 11, appellant was driving, Johnson was in the front passenger seat, and Carter was in the back seat. Johnson was pestering them to go to a bar with him and they agreed but appellant then changed his mind, saying he wanted to check his marijuana plants.

Appellant drove into the Paul Bunyan State Forest and stopped at a trailhead marked by three boulders. Carter testified that appellant got out and opened the sliding side door where Carter was sitting[3] and then opened Johnson's door. According to Carter, appellant then drew a 9 mm. pistol from his waistband and ordered Johnson out of the van. As Johnson stumbled out of the van, appellant shot him in the back of the head. Carter testified that appellant made a remark about "de-identifying" the body and seemed excited as appellant dragged the body down the trail into the woods, stripped off the clothes and amputated Johnson's hands, feet and head with a splitting maul from the van. Carter testified that appellant intended to burn the torso by putting brush and motor oil over the body but he didn't attempt to light it.

Carter testified that appellant encountered some hunters as he returned to the van with the shovel and maul. The Waln family hunted for deer every fall near the area in which Carter testified the murder took place, and Timothy Waln testified that at about 5 p.m. on November 11, 1996 he heard a shot from the area described by Carter. Timothy and Samuel Waln testified that they stowed their guns at their campsite and walked over to inform the shooter that hunting was not allowed on that side of the road. Both described a brief encounter with a male, reluctant to talk, standing next to a van in the area described by Carter. When presented with a photographic lineup by police, both identified appellant as the man they had seen on the evening of November 11, 1996. They were unable to identify appellant at trial, however.

Carter testified that after the hunters left, appellant placed Johnson's head,

---

**3.** Carter testified that the sliding side passenger door of the van could not be opened from the inside at the time of the murder because the handle was broken. This was corroborated by the testimony of appellant and a police investigator.

hands and feet in cardboard beer boxes and carried them back to the van leaving Johnson's torso on the trail. Carter testified that appellant then drove to a bridge over the Potato River. Appellant and Carter put bricks from the back of the van into some garbage bags appellant had in the van and put the head in one bag, the hands in a second bag, and the feet in a third bag. Carter testified that appellant threw the bags into the river, and he and appellant then drove to Cedar Lake and burned Johnson's clothes, the maul and the shovel, and discarded the remaining metal items in a nearby swamp. They then drove to Johnson's home where appellant entered through a window and knocked Johnson's phone off the hook. After leaving Johnson's house they went home, took showers and appellant did some laundry.

Carter also testified that later that night they returned to the murder scene in the dark. Appellant rolled the torso onto a plastic sheet and tied a large rock onto Johnson's chest with rope from his van. They loaded the body into the back of the van, drove to a bridge over the Crow Wing River and together they lifted it over the rail and threw it into the water. Later they burned the plastic sheet that was used to hold the body at a fire pit near the home of Carter's mother. Carter testified that when police questioned them two days later, Carter told police only what appellant directed him to say and that after talking with police, they drove past the place on the Potato River where the head, hands, and feet had been discarded and saw that the bag containing the head had surfaced. Appellant retrieved the head and they threw it out the window of the van into a ditch alongside a minimum maintenance road somewhere outside Walker, Minnesota.

Police investigators testified that the head was never found but a blood stain was identified on the railing of the bridge over the Crow Wing River where Carter said they had dumped Johnson's torso. When the torso was found, it was bound with nylon rope in a manner suggesting that a large object had been tied to it. Police found a rock on the river bottom in the vicinity of the torso that was free of moss, unlike the surrounding rocks, suggesting it might not have been there long and it may have been tied to the torso to keep it submerged. Police found burned foliage and two plastic caps like those found on oil containers where Carter testified they attempted to burn the torso.

Appellant testified and admitted he was present when the murder occurred but that it was Carter who told him to drive to the forest, Carter who pulled the trigger, Carter who dismembered the body, and Carter who decided how and where to dispose of the body. In his testimony he claimed that he was exhausted and weak the afternoon of November 11, 1996 after a hospitalization on November 9, and that he stopped the van at the particular point in the park only because he wanted to relieve himself. He heard the passenger side door and the sliding door open, and then the gun shot, but he and Carter often shot at targets in the woods and he claimed he did not realize Johnson was dead until he walked around the van and saw Carter standing over Johnson with the gun.

According to appellant, Carter shot Johnson in the back of the head, dragged his body down the trail, dismembered it, and placed the head, hands and feet in garbage bags. Appellant testified that Carter tied a rock to the torso and Carter alone lifted the body from the back of the van and dumped it into the Crow Wing river. Appellant denied that they tried to burn the torso but claimed Carter unsuc-

cessfully attempted to bury the torso in the frozen ground near the murder site. Appellant also denied that they went to Cedar Lake to burn the clothes, that they burned the plastic sheet used to hold the body, or that he did laundry the night of the murder and asserted that they didn't have a washing machine in the trailer at that time. He testified that they disposed of Johnson's clothing in bags in the Potato River along with the head, hands and feet and that Carter took the van the next morning and was gone all day.

Appellant's treating physician confirmed that appellant was hospitalized on November 9, 1996 due to an adverse reaction caused by drinking alcohol while taking a prescription medication, and that appellant was admitted for observation overnight to ensure that there would be no kidney damage. The next afternoon appellant signed himself out against medical advice and walked several miles home from the hospital. The physician also testified that in his opinion appellant would likely experience muscle soreness but not extreme weakness from the drug reaction.

Appellant and Carter both testified that Johnson was killed with a 9 mm. pistol that was one of a pair of identical pistols originally purchased by Carter, and that they often pawned their guns or sold them to one another when they were short of cash. They gave conflicting testimony regarding the ownership of the 9 mm. pistol, Carter claiming he sold appellant the gun before Johnson's murder, that it had stayed in appellant's possession, and that appellant was carrying the gun in his pants the evening of the murder; appellant claiming that they usually kept guns in a box between the front seats of his van, that he believed Carter had taken the gun from the box just before killing Johnson, and that the gun changed hands several times before and after the murder. Appellant also testified that after Johnson's murder Carter hid the gun underneath the couch and appellant moved the gun when they learned the police were planning a search of their home.

In his defense appellant offered the testimony of Jeffrey Carter (Jeffrey), Carter's nephew, who testified that when he was staying with his uncle in April or May of 1997 Carter told him that he shot Johnson and made a motion indicating that the body was then dismembered. During cross-examination Jeffrey testified that Carter said appellant encouraged Carter to shoot Johnson. Jeffrey also admitted that he was a heroin addict and had some memory problems, that he was not particularly close with Carter, and that he considered appellant a friend.

■ Appellant argues that his convictions for first- and second-degree murder are based on insufficient evidence as a matter of law because the only direct evidence of his active participation in the murder was the insufficiently corroborated testimony of his accomplice, Carter, and the evidence was equally consistent with the defense theory that he was an unwilling spectator to the murder. Minn.Stat. § 634.04 (2000).[4] Appellant concedes that "a person's presence, companionship and conduct before and after an offense are relevant circumstances from which a person's criminal intent may be inferred," *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn.1995), but asserts that the evidence here establishes only his presence at the

4. Minn.Stat. § 634.04 provides:

A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

scene of the crime and not criminal culpability. Appellant argues that he and Carter often drove to Paul Bunyan State Forest, they had equal access to one another's weapons, and the evidence that he lied to police and helped clean his van after Johnson's murder is only consistent with guilt as an accomplice after the fact. Appellant argues that the evidence of motive is weak and applies equally to Carter because both were asked to leave Johnson's home in October and Johnson's sexual threesome comment insulted both of them.

Appellant also argues that the trial court erred in allowing the state to introduce testimony regarding the two armed robberies because it tended to show that appellant is an unsavory character and that he has a propensity for criminal activity, an improper use of *Spreigl* evidence. *City of St. Paul v. Greene*, 238 Minn. 202, 206, 56 N.W.2d 423, 426 (1952) ("Evidence tending to show only propensity or disposition is inadmissible under any statement of the rule"). Even if admitted for a proper purpose, appellant maintains that the testimony regarding the robberies was irrelevant and immaterial because the circumstances of the robberies were not sufficiently similar to the circumstances of the charged crime with respect to location, motive and modus operandi.

The state argues that Carter's testimony was sufficiently corroborated by appellant's own testimony confirming many of the details of the murder, other witness testimony, and the physical evidence, and that evidence corroborating the testimony of an accomplice need not establish a prima facie case of appellant's guilt. *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980). The state further argues that appellant's anger and threats against Johnson hours before the murder provide evidence of motive, there is clear evidence of appellant's premeditation and culpability from his own testimony that he drove Johnson to the remote scene of the murder in the van loaded with the materials used to dismember and dispose of the body, that he was present when Johnson was murdered and dismembered, and that he drove the van to various locations to dispose of the body and conceal the crime. On this evidence, the state maintains, the jury could reasonably have found that appellant had motive and opportunity to kill Johnson and the murder was premeditated.

As to the *Spreigl* evidence, the state responds that evidence of these crimes was properly admitted to show appellant's ongoing criminal association and active, substantial cooperation in criminal activity with Carter, and was relevant and material to rebut appellant's defense theory that he did not actively participate in the murder. The state also contends that it assisted the state in meeting its burden of proving that appellant played an intentional and knowing role in Johnson's death. The state notes that the trial court gave the standard cautionary jury instructions[5] during

---

5. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 2.01 (3d ed.1990) was read to the jury before testimony regarding the Hackensack incident was introduced. The trial court instructed:

> [T]he State is about to introduce evidence of an occurrence on June 22, 1997 at Hackensack, Minnesota. This evidence is being offered for the limited purpose of assisting you in determining whether the defendant committed those acts with which the defendant is charged in the indictment.
>
> The defendant is not being tried for and may not be convicted of any offense other than the charged offenses. You are not to convict the defendant on the basis of any occurrence on June 22, 1997 at Hackensack, Minnesota. To do so might result in unjust double punishment.

trial and in final instructions to the jury. *See State v. Lynch*, 590 N.W.2d 75, 81 (Minn.1999) (stating that cautionary instructions based on CRIMJIG 2.01 and CRIMJIG 3.16 "assured that the jury did not give improper weight to the evidence.")

As a preliminary matter, we address appellant's claim that his conviction should be reviewed under the standard applicable to a conviction based on circumstantial evidence.[6] Appellant argues this standard is applicable because Carter's testimony that appellant actively participated in the murder was corroborated only by circumstantial evidence. We disagree. It is well-settled that in reviewing the sufficiency of the corroborating evidence of an accomplice's testimony, we review the evidence just as we would on a sufficiency challenge—in the light most favorable to the prosecution, and with all conflicts in the evidence resolved in favor of the verdict. *State v. Norris*, 428 N.W.2d 61, 66 (Minn.1988).

As to appellant's argument that Carter's testimony is insufficiently corroborated to support his conviction, we have held that accomplice testimony may be untrustworthy because of the risk that "[t]he accomplice may testify against another in the hope of or upon a promise of immunity or clemency or to satisfy other self-serving or malicious motives." *State v. Shoop*, 441 N.W.2d 475, 479 (Minn.1989). Therefore, "corroborative evidence supporting the testimony of an accomplice must be 'weighty enough to restore confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial way.'" *State v. Hooper*, 620 N.W.2d 31, 39 (Minn. 2000) (quoting *Norris*, 428 N.W.2d at 66–67).

The testimony and conduct of the accused and evidence linking the accused to the crime may lend credibility to accomplice testimony, *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980), and evidence of the accused's relationship with the accomplice may also be relevant and material corroborative evidence:

> Corroborating evidence may be secured from the defendant's association with those involved in the crime in such a way as to suggest joint participation, as well as from the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed.

*Adams*, 295 N.W.2d at 533 (citation omitted).

---

The instruction was repeated before the evidence of the July 6 and 7 occurrence at Deming, New Mexico was offered.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.16 (3d ed.1990) was read to the jury by the trial court at the close of the case:

> The State has introduced evidence of an occurrence on June 22, 1997, at Hackensack, Minnesota. As I told you at the time that this evidence was offered,* * * it was admitted for the limited purpose of assisting you in determining whether the defendant committed those acts with which the Defendant is charged in this indictment. The defendant is not being tried for and may not be convicted of any offense other than the charged offenses. You are not to convict the Defendant on the basis of the June 22, 1997 occurrence in Hackensack Minnesota. To do so might result in unjust double punishment.

The trial court then repeated the instruction in regard to the July 6 and 7 occurrence at Deming, New Mexico.

6. A conviction based on circumstantial evidence is reviewed to determine whether "the circumstances form 'a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.'" *State v. Bias*, 419 N.W.2d 480, 484 (Minn. 1988) (citation omitted).

■ Appellant further asserts that the evidence was insufficient as a matter of law to support his conviction. On a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution to determine "whether, on facts in the record and legitimate inferences drawn therefrom, a jury could reasonably conclude that the defendant was guilty." *State v. Ashby*, 567 N.W.2d 21, 27 (Minn.1997).

Carter's testimony regarding the time, place, manner of death, and the methods used to dispose of the body and conceal the crime are more than sufficiently corroborated. Appellant's own testimony corroborated Carter's account in several instances and provided evidence of appellant's guilt by confirming that appellant was present at the time of the murder and appellant drove Johnson to the scene in his vehicle loaded with the splitting maul, beer boxes, garbage bags, bricks and rope used to dismember and dispose of the body. Appellant's testimony also corroborates Carter's account of the location of the murder, the fatal shot to the back of Johnson's head from the 9 mm. pistol, the dismemberment with the splitting maul, the disposal of Johnson's head, hands and feet in the Potato River in garbage bags filled with bricks from the back of the van and the dumping of the torso into the Crow Wing River after lifting it onto the railing of the bridge.

Appellant also confirmed that the sliding side passenger door of the van next to where Carter was sitting could not be opened from the inside at the time of the murder because the handle was broken, but failed to explain how Carter got out of the van to murder Johnson if, as appellant claimed, he was not let out by appellant. The physical examination of the torso confirmed Carter's testimony that they drank with Johnson that afternoon and dismembered his body after his death with a splitting maul. The recovery of the torso on the banks of the Crow Wing River, the blood stain on the railing of the bridge over the Crow Wing, and the discovery of the bag filled with Johnson's hands and a brick in the Potato River further corroborate Carter's testimony of concealing the murder. The testimony of the hunter who heard the gunshot and saw appellant standing next to his van corroborates Carter's testimony of appellant's presence, that a single shot was fired, and that appellant was carrying tools to the van.

Other evidence supports Carter's statements that appellant took an active role in the murder—appellant's statements to police investigators in the days after the murder and testimony by Paula corroborate Carter's testimony as to appellant's anger at Johnson and possible motives for murder; testimony of the police investigator and two of Johnson's friends who spoke with appellant and Carter shortly after the murder corroborating Carter's testimony that appellant decided what to say to police, and that Carter went along with the story; appellant's denial of burning the body contradicted by the presence of the oil caps and burned foliage at the scene; and the evidence of the weight of the torso contradicts appellant's testimony that Carter alone lifted the torso over the bridge railing. Appellant's testimony that he hid the 9 mm. pistol when they learned police would search their home further corroborates Carter's testimony that appellant owned the gun and used it to kill Johnson and casts doubt on appellant's denial of these assertions. The *Spreigl* evidence supported the close relationship between appellant and Carter, and both *Spreigl* crimes were carefully planned and executed and provide persuasive evidence contradicting appellant's contention that he was an innocent and unwilling witness to John-

son's murder rather than an active participant.

■■■■■ As to the *Spreigl* crimes, admissibility is governed by Minn. R. Evid. 404(b):

> Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Spreigl* evidence is not admissible unless it is relevant and material to the prosecution's case and the probative value of the evidence is not outweighed by its prejudicial nature.[7] *State v. Lynch*, 590 N.W.2d 75, 80 (Minn.1999). A defendant claiming erroneous admission of other crimes evidence bears the burden of demonstrating the error and any resulting prejudice, *id.*, and such evidentiary rulings by the trial court will not be disturbed absent a clear abuse of discretion. *State v. Scruggs*, 421 N.W.2d 707, 715 (Minn.1988).

■■■■ The relevance of the *Spreigl* evidence here rests substantially in its demonstration of the nature of the accomplice relationship between Carter and appellant and its materiality in rebutting the defense theory that appellant was an innocent bystander. We have upheld admission where the circumstances of the prior crime were not identical to the charged offense but the "relevance of the evidence was otherwise clear." *Lynch*, 590 N.W.2d at 81 (citations omitted). The other crimes evidence admitted here was relevant to the prosecution's case to establish that appellant and Carter worked together closely to coordinate their criminal activity.[8] The evidence was important to the prosecution's case because it was not only material but also the most relevant evidence that appellant and Carter were accomplices in criminal activities. Its probative value clearly outweighed any potential prejudicial effect. We therefore hold that the trial court did not abuse its discretion in admitting the *Spreigl* evidence.

■■■■ Based on the ample evidence of appellant's involvement in the murder, the dismemberment of Johnson's body, concealing the crime and the relationship of appellant and Carter as accomplices in crime, a reasonable jury could well find beyond a reasonable doubt that appellant

---

7. In order to safeguard against the improper use of other crimes evidence, procedural requirements have been established such as the use of cautionary instructions. *State v. Shannon*, 583 N.W.2d 579, 583–84 (Minn.1998). Notice that the prosecution intends to use the evidence, indication by the prosecution regarding what the evidence is being offered to prove, and a clear and convincing showing that defendant actually participated in the other crime or bad act to be introduced are also required. *State v. Lynch*, 590 N.W.2d 75, 80 (Minn.1999). Appellant does not assert failure to comply with any of these requirements. The cautionary instructions were agreed upon by the parties and provided to the jury by the court. The state gave ample notice of its intention to offer the *Spreigl* evidence when it brought its motion in limine prior to jury selection. Appellant had been convicted of the Deming robbery at the time of trial, and there was clear and convincing evidence that appellant had also committed the Hackensack robbery.

8. The *Spreigl* testimony that appellant brandished the 9 mm. pistol during the robberies to intimidate the victims and shot at police following the Deming robbery further weakens appellant's description of himself as a frightened bystander to the murder, and lends support to Carter's testimony that appellant wielded the 9 mm. pistol in Johnson's murder. Appellant's statements during the standoff that he believed he would spend the rest of his life in jail and that Carter and Rossbach were "basically innocent" also lend further credibility to Carter's testimony that appellant was culpable for Johnson's murder.

was guilty of first-degree murder in Johnson's death.

Affirmed.

RUSSELL A. ANDERSON, J., took no part in the consideration or decision of this case.

PAUL H. ANDERSON, J. (concurring).

I concur with the majority's holding that Nelson's conviction should be affirmed. However, I write separately to express my concern about the last issue—the admission of other crimes evidence against Nelson. While there is substantial evidence of Nelson's participation in Johnson's murder such that the admission of the other crimes evidence is harmless, the aggravated robberies were not sufficiently similar to Johnson's murder to justify the admission.

Evidence of participation in other crimes, or *Spreigl* evidence, is not admissible for the purpose of showing that the defendant acted in conformity with character and thus, such evidence is only admissible if the other crime is "sufficiently or substantially similar to the charged offense—determined by time, place or modus operandi." *State v. Lynch*, 590 N.W.2d 75, 80–81 (Minn.1999). Looking at the time, place, and modus operandi of the aggravated robberies as compared to Johnson's murder illustrates that there is almost no similarity between the crimes and certainly not enough to classify the crimes as "substantially similar." Because of this lack of similarity, the robberies should not have been used in an attempt to establish that Nelson and Carter had a cooperative criminal relationship or worked closely to coordinate their criminal activity.

Johnson's murder took place seven months before the first aggravated robbery. Neither of the aggravated robberies occurred in Park Rapids or the Paul Bunyan State Forest, where the murder took place, and the second robbery did not even occur in Minnesota. The modus operandi of the *Spreigl* crimes bears no similarity to the murder, except in the fact that a weapon was used. The testimony presented establishes that only Carter and Nelson participated in Johnson's murder, while Carter, Nelson, and Rossbach all participated in the robberies. The robberies were carefully planned, involving walkie-talkies, duct tape to tie store employees, and a get-away vehicle. In contrast, according to both Carter and Nelson, the murder did not involve any advanced coordination between the two men or any coordination during the killing itself. Both Carter and Nelson also testified to the other's inability to dispose of Johnson's torso (either through burning or burying), suggesting that the disposal of the body had not been well-planned. The close proximity of the hunters and the failure of Carter and Nelson to plan for this contingency, as they did with the police scanner in the robberies, also suggests different levels of preparation and modus operandi.

The danger of the admission of *Spreigl* evidence is that the jury will "convict [the defendant] based on their assessment of him as a person or based on what he has done in the past." *State v. King*, 622 N.W.2d 800, 810–11 n. 6 (Minn.2001) (quoting *United States v. Bahe*, 40 F.Supp.2d 1302, 1312 (D.N.M.1998)). To avoid this possibility, the benefit of the doubt on the admissibility of *Spreigl* evidence is given to the defendant and the evidence is excluded. *Lynch*, 590 N.W.2d at 80. Therefore, I conclude that the district court committed an error, albeit a harmless error, when it admitted the evidence of the aggravated robberies at Nelson's trial.