**Lawrence James MONTANARO,
petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. A10–1633.

Supreme Court of Minnesota.

Sept. 7, 2011.

David W. Merchant, Chief Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Mark S. Rubin, St. Louis County Attorney, James T. Nephew, Assistant County Attorney, Duluth, MN, for respondent.

## OPINION

PAGE, Justice.

In this first-degree murder case, appellant Lawrence James Montanaro appeals from an order denying his petition for

postconviction relief. The petition, which Montanaro filed after the statute of limitations for filing a postconviction petition expired, alleged that Montanaro was entitled to a new trial because the trial court's self-defense jury instruction and the prosecutor's closing argument contained plain errors that affected his substantial rights. Montanaro's appeal presents two issues. First, whether Montanaro established that his petition fell within an exception to the postconviction statute of limitations. Second, whether the postconviction court abused its discretion when it denied Montanaro's request for a new trial based on the court's conclusion that the alleged errors did not satisfy the third prong of the plain error test because the errors did not affect Montanaro's substantial rights. Because we conclude that the alleged errors did not affect Montanaro's substantial rights, we affirm the postconviction court's denial of Montanaro's petition, without deciding whether Montanaro established an exception to the statute of limitations for filing a postconviction petition.

Montanaro was indicted for 15 felony counts, including first-degree murder for the death of a peace officer [1] in violation of Minn.Stat. § 609.185(4) (1992).[2] Montanaro pleaded not guilty and demanded a jury trial. At trial, the following evidence was presented. The record indicates Montanaro was 5 feet 7 inches tall and weighed 145 pounds; he worked as a machinist and would spend six or seven months in a city working until his "drinking started catch-

ing up" with him, at which point he would leave for a different city. Between February 28, 1990, and April 9, 1990, Montanaro lived at the Seaway Hotel in Duluth. Montanaro spent his days working and his nights and weekends drinking "[t]ill [he] couldn't drink no more." He would frequently go to the Midway Bar, located a half block from the Seaway Hotel, and then end up back in his room at the hotel sometimes not remembering how he got there. Montanaro often carried a .22 caliber pistol that he bought after an altercation he had with a "rather huge man" in Pennsylvania. He also had a .30 caliber carbine with a sawed-off stock, loaded with a full clip plus a round in the chamber, which he kept in his travel bag in the closet of his hotel room.

On the evening of April 9, 1990, Montanaro ended up at the Midway Bar where he became involved in an altercation with Mark Chumich; the record indicates Chumich was 6 feet 1 inch tall and weighed 300 pounds. Witnesses at the bar that night testified that Chumich was heckling and needling people, and that he typically "likes to kind of get things going" but then stops them by saying he was only "kiddin' around." Several witnesses testified that Montanaro and Chumich got into a "scuffle" with "loud voices" near the back of the bar and one witness overheard Montanaro tell Chumich "your size does not bother me" and "I will get you." The bartender

---

1. The term "peace officer" includes police officers. *See* Minn.Stat. § 626.84, subd. 1(c) (1996). For reading ease, we will refer to "peace officers" by their more commonplace designation: "police officers."

2. The indictments also alleged: one count of first-degree premeditated murder (Minn.Stat. § 609.185(a)(1) (2010) (renumbered in 2002; previously designated section 609.185(1))); five counts of attempted first-degree premeditated murder (Minn.Stat. § 609.185(a)(1);

Minn.Stat. § 609.17 (2010)); five counts of attempted first-degree murder for the attempted killing of a police officer (Minn.Stat. § 609.185(4); Minn.Stat. § 609.17); one count of attempted second-degree murder (Minn.Stat. § 609.19(1) (1994); Minn.Stat. § 609.17); one count of assault in the first degree (Minn.Stat. § 609.221 (1996)); and one count of assault in the second degree (Minn.Stat. § 609.222 (1990)).

later saw Montanaro follow Chumich out the back door.

Outside the bar, Montanaro called Chumich a "nasty" name. When Chumich turned around and started walking toward Montanaro, Montanaro backed away saying, "I'm gonna' get you, or ... kill you." Although there was enough space between Chumich and Montanaro for Montanaro to have escaped, Montanaro chose to pull out his pistol and shoot Chumich in the chest from a distance of about 10 to 12 feet. Montanaro then fled as Chumich went back to the bar for help. When the police officers arrived at the Midway Bar, they obtained a description of Montanaro but not his name.

Based on that description, the officers canvassed the neighborhood around the bar. The officers learned that a person matching the description lived at the Seaway Hotel in room 209/211 and that the person's last name was Montanaro. The officers went to Montanaro's hotel room and knocked loudly on the door with flashlights. When the officers received no response, an officer used a hotel phone to call Montanaro's room, but there was no answer.

An officer then called an assistant county attorney and advised him of the situation. After receiving permission from the assistant county attorney to enter Montanaro's room without a warrant, two uniformed officers and two plain-clothed officers proceeded to Montanaro's room, where they joined two uniformed officers who had been stationed outside Montanaro's room. Four of the officers took up positions on either side of the doorframe to Montanaro's room. The other two officers remained by the stairwell in the hallway, several feet from the doorway. All six officers had their service revolvers drawn.

At some point, one of the officers knocked on the door and yelled that it was the police and for Montanaro to come out of the room. After receiving no response, an officer used a key obtained from the front desk clerk to unlock the door and another officer turned the door handle and pushed open the door until it was stopped by the door's security chain. One of the officers then yelled that Montanaro was in the room and another yelled to kick in the door. As the officer kicked in the door, Montanaro repeatedly fired the .30 caliber carbine. The bullets passed through the door and wall, killing one officer and seriously injuring another.[3]

The officer closest to the door returned fire, emptying his revolver into the room. The door, which was self-closing, closed and, during a lull in the firing from within the room, the officers pushed the door open again. The firing from within the room resumed as the door opened. One of the officers was able to enter the room and fire two shots at Montanaro, who was firing through an opening in the wall between the kitchen and the bedroom. Montanaro threw his carbine on the bed and yelled something to the effect of "I give up, I surrender," at which point he was taken into custody. When the officers frisked Montanaro, they discovered the .22 pistol in his shirt pocket and four fully-loaded clips of .30 caliber ammunition in his outer jacket pocket. Montanaro asked the officers if he had hit any of them and made statements to the effect that he "didn't mean to shoot any of you guys."

**3.** Sergeant Gary Wilson had two bullet wounds: one a nonfatal, nonparalyzing wound to his neck, and the other a fatal wound to his head. Sergeant John Hartley was hit by a bullet that went through his left arm and lodged in his chest. The wound was life-threatening, but Hartley ultimately recovered except for the loss of function in his left hand as a result of nerve damage from the bullet's path through his arm.

Montanaro was then taken by ambulance to the hospital for treatment of bullet wounds to his cheek and to his ankle.

Montanaro testified to the following at trial. On the night of April 9, 1990, Montanaro woke up from a "blackout" to the sound of loud noises outside his door. According to Montanaro, he did not hear the officers announce themselves or knock on the door, but rather thought it was Chumich and his friends at the door coming to kill him. He then got out of bed, went to his closet, unzipped his travel bag, and grabbed his carbine and extra clips. Just as he was turning to face the door, the door was kicked open, at which point he yelled that he did not want to hurt anybody and fired a few shots "out in front of [the] door." He claimed that he would stop shooting when the door closed, but that it kept coming open, prompting him to resume firing until he had fired all 15 bullets from the gun's clip. The final time the door opened, he saw two silhouettes enter the room, which he claimed he purposefully "fired over" to miss hitting them. Montanaro surrendered when he realized the silhouettes were police officers because he heard the officers' CB radios, saw blue uniforms, and recognized that one of the silhouettes was "in an FBI stance."

On April 18, 1991, the jury found Montanaro guilty as charged. After convicting Montanaro of first-degree murder of a police officer, the district court sentenced Montanaro to a mandatory life term.[4] Montanaro did not file a direct appeal.

In 2003, Montanaro was diagnosed with dementia from Alzheimer's disease. The statute of limitations for filing a petition for postconviction relief expired on August 1, 2007. Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1098. On August 18, 2009, Montanaro informed the State Public Defender's Office that he wanted to challenge his convictions. The State Public Defender's Office subsequently filed a petition for postconviction relief on behalf of Montanaro, claiming that Montanaro was entitled to a new trial because the district court committed plain error when it instructed the jury that he had a duty to retreat and because the prosecutor committed misconduct during closing argument.[5] In response to Montanaro's petition, the State argued both that Montanaro's submissions failed to establish any of the statutory exceptions to the postconviction statute of limitations and that the postconviction court should reach the merits of the petition and conclude that the district court did not err and the prosecutor did not commit misconduct.

Without analysis, the postconviction court determined that Montanaro satisfied the interests-of-justice exception to the statute of limitations set forth in Minn. Stat. § 590.01, subd. 4(b)(5) (2010). After considering the merits of Montanaro's substantive claims, the postconviction court denied the petition in all respects. The postconviction court explained that the jury instruction as to the duty to retreat was erroneous, but that "no reasonable jury could find [Montanaro's] actions to be a reasonable use of force in self-defense."

4. The trial court also convicted Montanaro of five counts of attempted first-degree murder and one count of attempted second-degree murder. The trial court imposed four concurrent sentences of 240 months for four attempted first-degree murder convictions, a consecutive 180–month sentence for one attempted first-degree murder conviction, and a consecutive 153–month sentence for the attempted second-degree murder conviction.

5. Montanaro also claimed the trial court committed reversible error when it denied his pretrial suppression motion. But Montanaro does not renew this suppression claim on appeal.

The postconviction court further found that, although some of the prosecutor's statements were improper, they "did not rise to the level [requiring] a new trial."

On appeal, Montanaro claims the postconviction court abused its discretion when it concluded that the trial court's self-defense jury instruction and the prosecutor's closing arguments did not affect his substantial rights. The State raises the threshold issue of whether the postconviction statute of limitations bars Montanaro's petition for postconviction relief.

## I.

■ As a preliminary matter, the State argues that Montanaro's petition is time-barred. Minnesota Statutes § 590.01, subd. 4(a) (2010), provides that "[n]o petition for postconviction relief may be filed more than two years after the later of: (1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal." For people convicted before enactment of the statute, like Montanaro, the law provides that "[a]ny person whose conviction became final before August 1, 2005, shall have two years after [August 1, 2005] to file a petition for postconviction relief." Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1098.

In response, Montanaro does not contend that his petition is timely. Rather, he contends that his petition fits within two statutorily created exceptions to the statute of limitations. The two exceptions implicated in this appeal, in relevant part, provide:

Notwithstanding paragraph (a), a court may hear a petition for postconviction relief if:

(1) the petitioner establishes that a physical disability or mental disease precluded a timely assertion of the claim; ...; or

(5) the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice.

Minn.Stat. § 590.01, subds. 4(b)(1), (5) (2010). Specifically, Montanaro claims that his Alzheimer's disease prevented him from timely filing his petition and, alternatively, his petition is not frivolous and deserves to be heard in the interests of justice. As noted, the postconviction court, without analysis, determined that Montanaro satisfied the interests-of-justice exception to the time bar and addressed the merits of Montanaro's petition.

■ Generally, we review a postconviction court's determinations for abuse of discretion,[6] *see Quick v. State*, 692 N.W.2d 438, 439 (Minn.2005); however, the postconviction court's lack of findings and analysis makes it difficult for us to do so here. Normally, this would require a remand to the postconviction court for additional factual findings. *See State v. Wright*, 726 N.W.2d 464, 480–82 (Minn.2007). In this case, however, because we ultimately conclude that the postconviction court did not abuse its discretion when it concluded that the errors and misconduct alleged by Montanaro did not affect Montanaro's substantial rights, we will, for reasons of judicial economy, assume without deciding that Montanaro has satisfied one of the time bar exceptions in Minn.Stat. § 590.01,

**6.** The abuse-of-discretion standard controls our review of an order denying postconviction relief. *Reed v. State*, 793 N.W.2d 725, 729 (Minn.2010). Under this standard, "a matter will not be reversed unless the postconviction court exercised its discretion in an arbitrary or capricious manner, based its ruling on an erroneous view of the law, or made clearly erroneous factual findings." *Id.*

subd. 4(b), and dispose of Montanaro's claims on their merits.

## II.

 Montanaro claims the postconviction court abused its discretion when it concluded that errors allegedly committed by the trial court and the misconduct allegedly committed by the prosecutor did not satisfy the third prong of the plain error test. A defendant who fails to object to an error at trial, as Montanaro failed to do, is ordinarily deemed to have waived his right to appellate review of that error. *State v. Darris,* 648 N.W.2d 232, 241 (Minn.2002). However, the plain error rule, Minn. R.Crim. P. 31.02, provides a court, on motion for new trial, post-trial motion, or appeal, the discretion to review an unobjected-to trial error. *See State v. Evans,* 756 N.W.2d 854, 867 (Minn.2008). To satisfy the plain error rule, a defendant must establish (1) an error; (2) that is plain; and (3) that affects substantial rights. *State v. Vance,* 734 N.W.2d 650, 655–56 (Minn.2007) (citing *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn.2001)). But in the context of prosecutorial misconduct, the burden of proving the third prong of the plain error test rests on the State. *State v. Ramey,* 721 N.W.2d 294, 299–300

(Minn.2006).[7] An error affects a defendant's substantial rights if "the error was prejudicial and affected the outcome of the case." *State v. Barrientos–Quintana,* 787 N.W.2d 603, 611 (Minn.2010) (quoting *State v. Griller,* 583 N.W.2d 736, 741 (Minn.1998)) (internal quotation marks omitted). Such an error is prejudicial if the defendant proves that there "is a 'reasonable likelihood' that the error 'had a significant effect' on the jury's verdict." *Id.* (quoting *Griller,* 583 N.W.2d at 741) (internal quotation marks omitted). Finally, only if all three prongs of the plain error rule are met will a court order a new trial and then only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Crowsbreast,* 629 N.W.2d at 437 (alteration in original) (internal quotation marks omitted) (citing *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). Accordingly, if we find that any one of the requirements is not satisfied, we need not address any of the others. *State v. Pearson,* 775 N.W.2d 155, 161 (Minn.2009) (citing *State v. Everson,* 749 N.W.2d 340, 349 (Minn.2008); *State v. Goelz,* 743 N.W.2d 249, 258 (Minn.2007)).

The postconviction court concluded that the errors alleged to have been committed

---

7. Montanaro's 1991 trial took place before we announced the *Ramey* requirement that, while the defendant had to prove the other elements of plain error, the State now had to prove that the plain, unobjected-to prosecutorial misconduct did not affect the defendant's substantial rights. *Ramey,* 721 N.W.2d at 299–300. At the time of Montanaro's trial, we applied both the pre-*Ramey* plain error rule, which placed with the appellant the burden of proving all of the elements of plain error, as well as the *Caron* test, which employed two different standards of review based upon the seriousness of the misconduct, to unobjected-to prosecutorial misconduct. *See Ramey,* 721 N.W.2d at 298 (stating that, "in the 1980s, while some cases used the *Caron* standard to analyze unobjected-to prosecutorial misconduct, we also applied the plain error doctrine

in other cases of unobjected-to prosecutorial misconduct"). *Compare State v. Atkins,* 355 N.W.2d 410, 411 (Minn.1984) (discussing plain error in the context of analyzing unobjected-to prosecutorial misconduct), *with State v. Brown,* 348 N.W.2d 743, 747 (Minn. 1984) (applying *Caron* standard, using failure to object as a factor, and finding that the error was harmless). We need not and do not decide whether *Ramey* controls our review of prosecutorial misconduct that occurred before we announced the rule in *Ramey* because we conclude that, on the record before us, the State proved that the alleged prosecutorial misconduct did not affect Montanaro's substantial rights. Thus, no matter what standard of review we apply, Montanaro's claim of prosecutorial misconduct fails.

by the trial court and the alleged prosecutorial misconduct did not affect Montanaro's substantial rights.

## A.

■ In his petition for postconviction relief, Montanaro claims that he is entitled to a new trial because the district court committed plain error when it instructed the jury as follows:

> [Y]ou are further instructed that with respect to both the Midway Bar incident, which did not result in death, and the Seaway Hotel incident, which did result in death, that the legal excuse of self-defense is available only to those who act honestly and in good faith. *This includes the duty to retreat or avoid the danger if reasonably possible.*

(Emphasis added.) More specifically, Montanaro contends that it was error for the trial court to instruct the jury that the legal defense of self-defense includes a "duty to retreat or avoid the danger if reasonably possible" when defending one's self in one's abode.

■ We conclude, as did the postconviction court, that any error by the trial court in its instruction to the jury on self-defense did not affect Montanaro's substantial rights. We reach that conclusion because the self-defense instruction, as given, could not have had a significant effect on the jury's verdict. That is so because, as a matter of law, no reasonable jury could find Montanaro's actions to be a reasonable use of force. Once a defendant raises a claim of self-defense, the State must disprove beyond a reasonable doubt at least one of the following elements of self-defense:

> (1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.
> (2) The judgment of the defendant as to the gravity of the peril to which he was

exposed must have been reasonable under the circumstances.

> (3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Gray*, 456 N.W.2d 251, 257 (Minn. 1990) (quoting *State v. Boyce*, 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969)). In this case, along with the other instructions given to the jury, including the duty-to-retreat instruction, the jury was instructed that it had to find that Montanaro "had knowledge that the individuals outside his door were ... [police] officers" in order to convict Montanaro of first-degree intentional murder of a police officer. The jury's conviction of Montanaro for that offense necessarily means that the jury made a factual finding that Montanaro knew, at the time of the shooting, that the people outside his door were police officers. In light of Montanaro's knowledge that the people outside his door were police officers, no reasonable jury could have concluded that Montanaro's "judgment ... as to the gravity of the peril to which he was exposed" was reasonable. Furthermore, Montanaro's election to shoot his .30 caliber carbine through the door at the police officers was not an election "such as a reasonable man would have made in light of the danger to be apprehended." As a result, Montanaro's defense of self-defense failed as a matter of law. Thus, there is no reasonable likelihood that a properly instructed jury could have found that Montanaro acted in self-defense. Because we conclude that the trial court's self-defense instruction as given could not have affected Montanaro's substantial rights, we also conclude that the postconviction court did not abuse its discretion when it denied Montanaro relief on this claim.

**B.**

In his petition for postconviction relief, Montanaro also claims that he is entitled to a new trial because the prosecutor committed misconduct by making the following statements during closing argument. First, according to Montanaro, the prosecutor improperly attacked Montanaro's character by referring to Montanaro as having a "little man complex" and as being a "drifter," the latter of which Montanaro admits. Second, the prosecutor improperly vouched for the truthfulness of the witnesses by telling the jury that the police officers were "honorable" and "truthful" men and for using personal pronouns such as "what we have here." Third, the prosecutor improperly speculated on events by suggesting that Montanaro wanted to go "down in a blaze of glory." Fourth, the prosecutor inflamed the passions and prejudices of the jury by stating, "But for the divine grace of God, six other men would have died that night." Montanaro contends that, even if these improper arguments did not individually warrant reversal, the cumulative weight of the misconduct did. The State argues that these statements were made based on evidence in the record and, in any event, were not unduly prejudicial. The postconviction court found that, although the prosecutor may have made some improper comments, those comments did not rise to a level requiring a new trial.

As mentioned above, an error affects a defendant's substantial rights "if there is a 'reasonable likelihood' that the error 'had a significant effect' on the jury's verdict." *State v. Barrientos–Quintana,* 787 N.W.2d 603, 611 (Minn.2010) (quoting *State v. Griller,* 583 N.W.2d 736, 741 (Minn.1998)) (internal quotation marks omitted).

Having thoroughly reviewed the prosecutor's closing arguments in light of the entire record, we conclude that, to the extent that any of the prosecutor's statements made during closing arguments constituted misconduct, that misconduct, whether viewed in isolation or collectively, did not have a significant effect on the jury's verdict and thus did not affect Montanaro's substantial rights. Consequently, the postconviction court did not abuse its discretion when it concluded that the prosecutor's statements did not affect Montanaro's substantial rights.

**III.**

Because neither the trial court's jury instruction on self-defense nor the statements by the prosecutor that Montanaro contends constituted prosecutorial misconduct affected Montanaro's substantial rights, we affirm Montanaro's convictions in all respects.

Affirmed.