*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0568**

State of Minnesota,
Respondent,

vs.

Joshua Alan Pourrier,
Appellant.

**Filed March 2, 2015
Affirmed
Reyes, Judge**

Faribault County District Court
File No. 22CR13407

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Lori Swanson, Attorney General, Matthew Frank, Assistant Attorney General, St. Paul, Minnesota; and

Troy Timmerman, Faribault County Attorney, Blue Earth, Minnesota (for respondent)

Considered and decided by Reyes, Presiding Judge; Worke, Judge; and Johnson, Judge.

## U N P U B L I S H E D   O P I N I O N

**REYES**, Judge

Appellant Joshua Alan Pourrier challenges his conviction of attempted first-degree burglary and terroristic threats, arguing that the district court erroneously instructed the

jury on the elements of the crime, that appellant was prejudiced by the introduction of testimony that he had been in jail, and that the prosecutor committed misconduct in his closing statement depriving appellant of a fair trial. We affirm.

**FACTS**

On July 11, 2013, J.E., while on a walk in the downtown area of Wells, Minnesota stopped to join a party at a house where people were socializing and drinking alcohol on the front lawn. J.E. met appellant and Nicholas Thamez for the first time at the party. Later, the three men left the party and continued drinking at J.E.'s house. They then walked to appellant's house so appellant could get his phone charger. While waiting outside for appellant, J.E. and Thamez got into an argument. After yelling back and forth at each other, J.E. left and walked back to his house by himself.

About a half hour later, J.E. heard banging at his door and people yelling. J.E. got his gun and shot a few bullets at the door before he called the police. J.E. told the 911 dispatcher that there were "some people at [his] house trying to kill [him]" and that he had "shot a couple bullets through the door" to try to get them to leave. The dispatcher told J.E. that an officer was being dispatched to the home and told J.E. to put his gun away. At around the same time, Thamez also made a 911 call. Thamez told the 911 dispatcher that he was trying to retrieve his cell phone from inside J.E.'s home and that J.E. had shot at them through the door.

Wells police officer Eric Neubauer was the first officer to arrive and saw appellant and Thamez at the back door of J.E.'s home. Officer Neubauer observed one man screaming and banging at the door, while the other one was talking on a cell phone. It

2

appeared to Officer Neubauer that the two men were either trying to enter the home or "yell through to the guy in the house." Officer Neubauer heard one of them yell, "I'm going to kill the mother f-cker. He shot at us. He's going crazy." Officer Neubauer asked appellant and Thamez what was going on, and appellant told the officer that he left his phone inside J.E.'s home and was trying to get it back. Officer Neubauer noticed that appellant and Thamez were intoxicated. At that time, Faribault County Sheriff's Deputy Steven Linde arrived at the scene. Deputy Linde stayed with appellant and Thamez while Officer Neubauer went to speak to J.E. While inside J.E.'s home, Officer Neubauer observed some "small dents in the door" and cracking on the door frame around the bolt. J.E. appeared to be "very shooken up" and "distraught." J.E. was also intoxicated.

Officer Neubauer brought appellant back to the police station for an interview, which was recorded. Appellant told the officer that the three men had all been drinking earlier in the day. Appellant stated that, at some point, they all walked back to appellant's house to get appellant's phone charger. While appellant was inside his house, there was some sort of conflict between J.E. and Thamez and J.E. decided to walk home by himself. After appellant realized that he had left his phone at J.E.'s house, appellant and Thamez walked back there and knocked on the door to get the phone back. Appellant stated that the entire time he was outside he was telling J.E. that he was there to get his phone. The following day, appellant's phone was returned to him after it was found inside of J.E.'s home.

Based on these facts, appellant was charged with attempted first-degree burglary and terroristic threats. Prior to trial, the state filed a motion requesting that appellant's

3

interview with Officer Neubauer be played in its entirety, with the exception of the Miranda warning and the portion where appellant makes a reference to having previously been incarcerated. In the same motion, the state also requested that the district court acknowledge the parties' agreement to submit the 911 calls of J.E. and Thamez into evidence by stipulation, without additional foundation.

At the beginning of the trial and outside the presence of the jury, the district court heard the parties' arguments with respect to the state's motion. Appellant objected to the state's request to play the recording of appellant's interview with Officer Neubauer in its entirety and argued that doing so would risk allowing improper or inadmissible statements relating to appellant's prior incarceration into the record if the recording was not properly edited. Over appellant's objection, the district court granted the state's request to play the recording of appellant's statement in its entirety, excluding the portions as described by the state. The court also accepted the parties' agreement to play the 911 tapes.

During the trial, J.E. testified that, after hanging out and drinking with appellant and Thamez earlier that day, J.E. walked back to his house after he got into an argument with Thamez. J.E. testified that about a half an hour later, there was "a ton of banging on [his] door all of a sudden" and "[it] sounded like people were kicking it and . . . it was about to be kicked open." J.E. testified that appellant and Thamez were screaming "f you" and "f'n kill you" at him through the door. J.E. testified that he was scared because he believed that they wanted to beat him up. J.E. admitted that he fired three shots towards the door before calling 911. J.E. did not hear anyone say they were looking for a

4

phone. In response to the state's question as to whether J.E. "[knew] either [appellant] or his friend well enough to have a sense . . . of what they were capable of," J.E. answered, "I knew [appellant and Thamez] were both in prison before." Appellant objected to this testimony and moved the district court for a mistrial. The district court denied appellant's motion and instructed J.E. not to make any further comments concerning the criminal history of appellant or Thamez. At appellant's request, the district court also gave the jury curative instructions.

After a few more questions of J.E., the state requested to play J.E.'s 911 telephone call for the jury. On the record, the parties stipulated to the recording of the 911 tapes being played to the jury. Appellant's counsel indicated to the district court that she had the opportunity to listen to both 911 tapes prior to trial. The 911 tape of J.E.'s call was played to the jury which included a statement J.E. made to the dispatcher stating, "I ended up f-cking with these people and they were both in prison." Appellant did not object at that time. Appellant did not testify at trial. After hearing testimony from the officers that responded to the incident that day, the district court gave the jury instructions, and the jury returned guilty verdicts on both counts. This appeal followed.

## D E C I S I O N

## I.

Appellant argues that the district court erred by failing to instruct the jury on either the definition or the elements of the alleged predicate "crime of violence."

Jury instructions must fairly and adequately explain the law of the case. *State v. Peterson*, 673 N.W.2d 482, 486 (Minn. 2004). It is well-settled that jury instructions

5

must define the crime charged, and the district court must explain the elements of the offense to the jury. *State v. Ihle*, 640 N.W.2d 910, 916 (Minn. 2002). A defendant is entitled to have all the elements of the offense with which he is charged submitted to the jury, even if evidence relating to an element is uncontroverted. *State v. Carlson*, 268 N.W.2d 553, 560 (Minn. 1978).

The Criminal Jury Instruction Guide provides the model instruction on the elements of terroristic threats, including an instruction identifying the predicate offense and providing the elements of that offense. 10 *Minnesota Practice*, CRIMJIG 13.107 (2006). Under the terroristic-threats statute, a person must threaten to commit a "crime of violence." Minn. Stat. § 609.713, subd. 1 (2014). A "'crime of violence' has the meaning given 'violent crime' in section 609.1095, subdivision 1, paragraph (d)." Minn. Stat. § 609.713, subd. 1 (2014). Section 609.1095, subdivision 1(d) restricts "violent crime" to certain, specifically delineated crimes. It is undisputed that the district court's instructions did not identify the predicate crime of violence or provide the definition or elements of that predicate crime as recommended by the jury instruction guide.

Because appellant did not object to the jury instructions during trial, we review for plain error. *See State v. Milton*, 821 N.W.2d 789, 805 (Minn. 2012) (stating that when a defendant fails to object to jury instructions during trial, this court has the discretion to review the issue on appeal for plain error). Under the plain-error test, appellant must show (1) error, (2) that was plain, and (3) that affected the "substantial rights" of appellant. *Id.* If all three prongs are satisfied, then a reviewing court may decide whether

to address the error to ensure the "fairness and the integrity of the judicial proceedings." *Id.* (quotation omitted).

The state concedes that the first two prongs of the plain-error test are met: the district court erred, and the error was plain. *See State v. Jorgenson*, 758 N.W.2d 316, 323-34 (Minn. App. 2008), *review denied* (Minn. Feb. 17, 2009). Therefore, the issue before us is whether the plain error affected appellant's substantial rights.

The omission of an element of a crime in a jury instruction does not automatically necessitate a new trial. *State v. Watkins*, 840 N.W.2d 21, 28 (Minn. 2013). Instead, a reviewing court must conduct a thorough examination of the record to determine whether the omitted element of a charged offense from the jury instruction was "sufficiently prejudicial." *Id.* at 28-29. In doing so, we may consider, among other factors, whether: "(1) the [appellant] contested the omitted element and submitted evidence to support a contrary finding, (2) the [s]tate submitted overwhelming evidence to prove that element, and (3) the jury's verdict nonetheless encompassed a finding on that element." *Id.* at 29.

The uncontroverted evidence in this case established that appellant threatened to kill J.E. This evidence was presented to the jury during J.E.'s 911 call, where J.E. told the dispatcher on several occasions that there were people pounding on his door and that they were threatening to kill him. Officer Neubauer also testified that when he arrived at J.E.'s house he heard someone scream, "I'm going to kill the mother f-cker. He shot at us." While neither J.E. nor Officer Neubauer testified that these threats were made by appellant and not Thamez, appellant admitted to Officer Neubauer, in an interview that was presented to the jury, that he was "the only one saying anything" to J.E. while the

7

men were outside of the home. There was substantial evidence presented to the jury to prove that appellant threatened to kill J.E.

It is well-established in the record that homicide was the predicate crime of violence threatened, and homicide of *any* degree is defined as a crime of violence. *See* Minn. Stat. § 609.1095, subd. 1(d) (defining "violent crime" to include first-, second- and third-degree murder; first- and second-degree manslaughter; and criminal vehicular homicide). Therefore, as a matter of law, threatening to kill is a threat to commit a "crime of violence" for purposes of the terroristic threats statute. *Cf. State v. Schweppe*, 306 Minn. 395, 400, 237 N.W.2d 609, 614 (1975) (stating that threatened killing was a "crime of violence" under homicide statutes then in effect).

The district court did not specifically identify the predicate crime of violence as recommended by the jury instruction guide. But "the jury instruction guides merely provide guidelines and are not mandatory rules." *State v. Kelley*, 734 N.W.2d 689, 695 (Minn. App. 2007), *review denied* (Minn. Sept. 18, 2007). Moreover, jury instructions are to be considered as a whole. *State v. Glowacki*, 630 N.W.2d 392, 402 (Minn. 2001). The district court instructed the jury that, to return a guilty verdict, it must find that the state proved all three elements of terroristic threats beyond a reasonable doubt. Because jurors are presumed to follow a district court's instructions, *State v. Miller*, 573 N.W.2d 661, 675 (Minn. 1998), this court can presume that the jury found, beyond a reasonable doubt, that appellant threatened to kill J.E., which is a crime of violence as a matter of law. Accordingly, appellant has not met his burden.

8

Appellant argues next that the district court's subsequent jury instruction, defining assault with respect to attempt and first-degree burglary definitions and elements, could have caused the jury to assume that the threatened "crime of violence" was possibly an assault. Appellant argues that this confusion makes the case more factually similar to the facts in *Jorgenson.* We are not persuaded.

In *Jorgenson*, a defendant was charged with terroristic threats, and the predicate crime of violence underlying the terroristic threat was identified as assault. 758 N.W.2d at 322. Although the district court gave instructions to the jury that "assault is a crime of violence," it gave no further definition of assault. *Id.* at 320. However, Jorgenson was also charged with misdemeanor domestic assault pursuant to Minn. Stat. § 609.2242, subd. 1(2) (2006). Misdemeanor domestic assault is not a crime of violence. The jury found Jorgenson guilty of both offenses. *Id.* We held that the district court committed plain error because, while "violent crime" under section 609.1095 includes first-, second-, and third-degree assault, it does not include domestic assault, fourth-, or fifth-degree assault. *Id.* at 323-24 (citing Minn. Stat. § 609.1095, subd. 1(d) (2014)). We concluded that Jorgenson had been prejudiced because the jury could have determined that he was guilty of no more than misdemeanor domestic assault but that this was insufficient to support the terroristic threats conviction under section 609.1095. *Id.* at 325.

Unlike *Jorgenson,* there is no concern that the jury employed the assault definition from the attempted burglary definition for the terroristic threat conviction. Specifically, the state argued in closing, "Now, we have as one of the charges here, terroristic threats, and [J.E.] said that he heard them threatening to kill him." Here, the state's opening and

9

closing arguments directly reference appellant's threats to kill J.E. when discussing the charge of terroristic threat. Moreover, in contrast to *Jorgenson*, the district court did not inform the jury that assault is a crime of violence. Finally, the predicate crime of homicide, in any degree, is indeed a "crime of violence." Because appellant has not established that the district court's terroristic-threats jury instruction affected his substantial rights, he is not entitled to relief on this ground.

## II.

Appellant contends that the introduction of evidence that appellant had been in prison prejudiced appellant's right to a fair trial. This happened on two separate occasions; once during J.E.'s testimony and a second time during J.E.'s conversation with the 911 dispatcher. On appeal, appellant only challenges the statement that was made in the 911 tape which was played to the jury. Appellant made no objection to this statement at trial and we review for plain error. *See* Minn. R. Crim. P. 31.02; *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002).

### A.     Error

Generally, "references to prior incarceration of a defendant can be unfairly prejudicial." *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006). However, such evidence can be admitted when it is relevant and the relevance outweighs any potential prejudice. *See State v. Stephenson*, 361 N.W.2d 844, 845-46 (Minn. 1985). Evidence which is not relevant is inadmissible. Minn. R. Evid. 402. Here, evidence of appellant's prior incarceration did not have any probative value. For this reason, the evidence should

10

not have been admitted. Accordingly, the introduction of evidence that appellant had previously been incarcerated was error.

## B. Substantial rights

Even if admission of this statement was error, it was not prejudicial to appellant's substantial rights.[1] The reference made by J.E. in his 911 call was a part of a recording that the parties had the opportunity to review prior to trial. It was also a passing and isolated reference as the tape did not include additional statements about appellant's prior incarceration nor did the state make any additional references to it. *See State v. Haglund*, 267 N.W.2d 503, 506 (Minn. 1978) (finding that a witness's testimony that a defendant had previously been incarcerated was not reversible error because the testimony was not intentionally elicited, the statement was "of a passing nature," and the evidence in [the] case was overwhelming").

Additionally, the evidence of appellant's guilt was sufficient. J.E. testified several times that appellant threatened to kill him and was pounding on his door, trying to enter his home. Officer Neubauer observed damage to the door consistent with this testimony. Officer Neubauer also testified to hearing one of the men yelling that he was going to kill J.E. In the 911 call, J.E. told the dispatcher multiple times that appellant was trying to kill him. There was also testimony from J.E. that he told appellant and Thamez to leave and did not want them there. Because there is sufficient evidence of appellant's guilt, the

---

[1] Because we determine that the error did not affect appellant's substantial rights, we need not reach the issue of whether the error was plain. *See Montanaro v. State,* 802 N.W.2d 726, 732 (Minn. 2011) ("[I]f we find that any one of the requirements [under the plain-error test] is not satisfied, we need not address any of the others.").

fleeting reference to his prior incarceration in the 911 tape in a two-day trial did not affect appellant's substantial rights.

**III.**

Lastly, appellant argues that he was denied a fair trial based on the prosecutor's prejudicial misconduct during closing argument. Specifically, appellant asserts that the state argued facts not in evidence and improperly urged the jury to protect society and to send a message with its verdict. We will address each in turn.

Appellate courts review closing arguments in their entirety to determine whether prosecutorial misconduct occurred. *State v. Vue*, 797 N.W.2d 5, 15 (Minn. 2011). "The prosecutor has the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefore." *State v. Williams*, 586 N.W.2d 123, 127 (Minn. 1998) (quotation omitted). However, a prosecutor may not argue facts unsupported by the record. *See State v. Ferguson*, 729 N.W.2d 604, 616 (Minn. App. 2007), *review denied* (Minn. June 19, 2007) (holding that it is improper for a prosecutor to make arguments unsupported by the record). A prosecutor must also avoid arguments that inflame the jury's passions and prejudices against the defendant. *State v. Rucker*, 752 N.W.2d 538, 551 (Minn. App. 2008), *review denied* (Minn. Sept. 23, 2008).

**A.     Facts not in evidence**

In the state's closing argument, the prosecutor argued "[e]very day in this state and every other state in our union you can pick up your newspaper and find, read about some

12

assault or some homicide . . . ." Appellant objected to this statement and argued that the state's argument was not supported by the record. The objection was overruled.

An objected-to claim of prosecutorial misconduct is reviewed under the two-tier harmless-error test. *State v. Yang*, 774 N.W.2d 539, 559 (Minn. 2009). Appellate courts "first address whether there was misconduct, and if so, whether it entitles [appellant] to a new trial." *State v. Wren*, 738 N.W.2d 378, 390 (Minn. 2007). In cases involving unusually serious prosecutorial misconduct, the conduct is reviewed to determine whether it was harmless beyond a reasonable doubt. *Yang,* 774 N.W.2d at 559. We review claims of less-serious prosecutorial misconduct to determine whether it likely played a substantial part in influencing the jury to convict. *Id.*

We conclude that the prosecutor's argument constituted misconduct. Here, the prosecutor used the statement to inflame the jury's passion and improperly encouraged the jury to convict appellant because of the crime problem in general. *See State v. Clark*, 296 N.W.2d 372, 377 (Minn. 1980) (determining that improper suggestions to the jury that they should convict a defendant "because of the crime problem in general" constitutes misconduct). The statement was not asserted by the state as evidence of appellant's guilt, nor was the statement based on evidence produced at trial. Therefore, this statement by the prosecutor during the closing argument was misconduct.

This type of prosecutorial argument is not encouraged. Nevertheless, in view of the entire record as a whole, this lone statement did not likely play a substantial part in influencing the jury to convict appellant. Accordingly, we conclude that this statement does not rise to the level to warrant reversal.

**B.    Improper encouragement of jury to send a message through its verdict**

Appellant also argues that there was prosecutorial misconduct because the prosecutor improperly encouraged the jury "to send a message" with its verdict. Appellant relies on the following portion of the state's closing argument:

> In a sense it's not a big case[.] . . . [B]ut it's an important case.  It's important for many reasons, but the primary reason that it's important is that it's a case involving personal safety, boundaries if you will, and it's involving basically a concept of civilized behavior and the safety of the general public.

Appellant did not make any objections to this portion of the closing argument at trial. When an appellant does not object to an alleged prosecutorial error at trial, we apply the modified plain-error standard of review.  *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006) (stating that the burden shifts to the state to demonstrate that the misconduct did not affect substantial rights).

**1.    Error**

"It is improper for the [state] to make statements urging the jury to protect society or to send a message with its verdict."  *State v. Duncan*, 608 N.W.2d 551, 556 (Minn. App. 2000), *review denied* (Minn. May 16, 2000).  Appellant relies on *State v. Threinen*, 328 N.W.2d 154 (Minn. 1983), to argue that this statement by the prosecutor was improper.  We agree.

In *Threinen*, the prosecutor made statements during closing argument "suggesting that the jury represented the people of the community and that their verdict would determine what kind of conduct would be tolerated on the streets."  328 N.W.2d at 157. The court held that those types of comments were improper.  *Id.*  The comments in the

14

instant case are much like closing arguments disapproved by the *Threinen* court.  Here, the prosecutor urged the jury to convict because appellant's case is an "important case" that involves "a concept of civilized behavior and the safety of the general public." These types of remarks distract a jury from its proper role of deciding whether the state has met its burden, and instead urge the jury to view this case as a way to send a message. *See State v. Montjoy*, 366 N.W.2d 103, 109 (Minn. 1985) (prosecutors "should not emphasize accountability to such an extent as to divert the jury's attention from its true role").  These statements by the prosecutor constitute error.

## 2.      Substantial rights

While these statements are prosecutorial error, we conclude that reversal is not necessary.  Here, the defense did not object or seek curative instructions, "a factor that this court has said 'weighs heavily' in its decision whether to reverse on that ground." *Clark,* 296 N.W.2d at 377.  Furthermore, the challenged statements make up only a small portion of the closing argument.  Because the state has established that it is not reasonably likely that the purported misconduct had a significant effect on the jury's verdict, appellant is not entitled to relief on this ground.

**Affirmed.**