*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1120**

State of Minnesota,
Respondent,

vs.

Eddie Manuel Demmings,
Appellant.

**Filed June 13, 2016
Affirmed
Bjorkman, Judge**

Anoka County District Court
File No. 02-CR-14-3800

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Kelsey R. Kelley, Assistant County Attorney, Anoka, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Lydia Villalva Lijó, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Bjorkman, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant challenges his convictions of first-degree aggravated robbery and first-degree burglary, arguing that the evidence is insufficient to support the convictions, that he

was convicted based on uncorroborated accomplice testimony, and that the district court erred when instructing the jury. We affirm.

## FACTS

On the evening of November 7, 2013, F.S. was alone in his rural Oak Grove home when he saw headlights coming up his driveway. After the vehicle stopped, F.S. observed a man walking across his yard. F.S. grabbed a flashlight, went outside, and asked the man what he was doing. The man approached F.S. and struck him on the nose, rendering him unconscious. When F.S. came to, the man was on top of him and covering his mouth with a gloved hand.

While he was pinned down, F.S. observed a second man walk toward his house. He also heard a woman say, "hurry, up, get in there." F.S. did not see the second man again, and never saw the woman. F.S. struggled to free himself, but the man took F.S.'s flashlight and struck him over the head. The man then demanded that F.S. accompany him to the house. When they got inside, the man struck F.S. over the head with the flashlight. When F.S. regained consciousness, he was alone and a lock box containing approximately $20,000 in cash was missing from the kitchen. F.S. called 911.

Deputy Justin Michael Weller of the Anoka County Sheriff's Department responded to the call. F.S. told him that two men had been involved. He described one man as being quite a bit smaller than the other, and that the larger man—who assaulted him—was wearing a gray hooded sweatshirt. F.S. said that only three people knew about the $20,000 in the lock box: F.S.'s son, his son's daughter A.P., and A.P.'s mother, Jane Parker.

2

Deputies searched the premises and discovered various items that did not belong to F.S., including a folding knife, a left-handed cloth glove, the tip of a blue latex glove, a safe handle, zip ties, and blue nylon rope. The officers observed a fresh set of tire tracks, and documented two distinct sets of footprints that did not belong to F.S. One set was found near where the suspect's vehicle had been parked and led up to F.S.'s house. One of these impressions contained blood. The other set was only found near where the vehicle had been parked.

Detective Nathan Arvidson spoke with F.S.'s son the day after the assault. The son indicated that he suspected Parker was involved with the assault and burglary. Detective Arvidson discovered that Parker drove a Nissan Maxima and was also seen in a Chevrolet Trail Blazer. He learned from the Brooklyn Center Police Department that Parker was involved with appellant Eddie Manuel Demmings. An alert was issued for Parker, Demmings, and both vehicles.

On November 10, a Brooklyn Center police officer observed the Nissan in a motel parking lot. Parker and Demmings were located inside the motel and arrested. Detective Gary Patterson of the Anoka County Sheriff's Department interviewed and released Parker after determining that she did not have any useful information. Three days later, the same Brooklyn Center police officer spotted the Trail Blazer. Parker was the sole occupant and was extremely uncooperative. After arresting Parker, the officer noticed a bulge in her sleeve jacket, and discovered $7,430 hidden inside a sock. Parker later testified that Demmings gave her the sock of money shortly before her arrest.

On November 18, Parker contacted Detective Patterson with additional information. She reported that Demmings lived with her and they were "broke." Before the assault and burglary, she told Demmings that F.S. kept a large amount of money in his home, and the two of them previously visited the area near F.S.'s house. She also stated that the knife recovered at F.S.'s home belonged to her and that the left-handed cloth glove belonged to Demmings. She consented to a search of her car, and officers discovered a gray hooded sweatshirt similar to the one described by F.S. Parker indicated that the sweatshirt was hers, but that Demmings frequently wore it. Several days later, Parker contacted law enforcement and stated she had other items they might be interested in. She turned over a right-handed cloth glove that matched the left-handed glove found at the scene. She also indicated that the blue nylon rope found at the scene was used as a makeshift leash for Demmings's dogs. And Parker reported that Demmings changed the tires on the Trail Blazer on November 8 or 9, after the assault, and dropped the old tires off at his cousin's house.

Around Thanksgiving, officers executed a search warrant at the home of Demmings's cousin looking for the tires that had been removed from the Trail Blazer. They did not locate the tires. Demmings later told E.W., a friend of his child's mother, that the police were searching for the tires, but that "they were long gone probably somewhere in Mexico." E.W. also saw Demmings pull a wad of cash out of his pocket that was so large Demmings had a hard time taking it out of his pocket. She was surprised to see Demmings with so much money.

4

Respondent State of Minnesota charged Demmings with first-degree aggravated robbery and first-degree burglary. At trial, F.S. did not positively identify Demmings, but testified that his "face looks familiar" and that he "looks like the guy that was . . . looking in my [garbage] can." A jury found Demmings guilty of both offenses, and the district court imposed concurrent 93-month sentences. Demmings appeals.

## D E C I S I O N

**I.    The evidence is sufficient to sustain Demmings's convictions.**

When reviewing a sufficiency-of-the-evidence challenge, we carefully examine the record evidence to determine whether the fact-finder could reasonably find the defendant guilty of the charged offense. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). When a conviction is based on circumstantial evidence, we use a two-step process. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). We first identify the circumstances proved—the evidence supporting the jury's guilty verdict. *Id.* We then independently examine the reasonableness of the inferences the jury could draw from those circumstances. *Id.* at 599. "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002).

But we do not weigh the evidence, even in circumstantial-evidence cases. *State v. Stein*, 776 N.W.2d 709, 714 (Minn. 2010). "[T]he jury is in the best position to evaluate the credibility of the evidence," and it has already done so. *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). Thus, when determining the circumstances proved, we "assume that

the jury resolved any factual disputes in a manner that is consistent with the jury's verdict." *Id.* We consider "only those circumstances that are consistent with the verdict." *Silvernail*, 831 N.W.2d at 599.

> **A.** **The circumstances proved are inconsistent with any rational hypothesis other than guilt.**

Demmings argues that the evidence was insufficient because the circumstances proved do not eliminate the rational hypothesis that a second individual stole the lock box. He asserts the circumstances proved establish that two individuals played distinct roles: one assaulted F.S. while the other entered the home and stole the lock box. He argues that because first-degree aggravated robbery and first-degree burglary require that the offender both assault an individual and unlawfully take property, he cannot be convicted of either offense. We are not persuaded.

First, Demmings misstates the circumstances proved. His assertion that two individuals committed distinct crimes is based on F.S.'s testimony that he saw a second man walking toward his home while he was being assaulted. But when identifying the circumstances proved, we must assume the jury resolved any factual disputes in a manner consistent with the verdict. *Moore*, 846 N.W.2d at 88. The jury was free to believe or disbelieve the various witnesses and accept or reject the defense argument that someone other than Demmings stole the lock box. By finding Demmings guilty of both offenses, the jury implicitly rejected the notion of a second man committing the theft. Accordingly, that is not part of the circumstances proved.

The circumstances proved include the following: Parker told Demmings about the lock box and money in F.S.'s house. Demmings was homeless before moving in with Parker and complained about not having enough money. On November 7, F.S. was assaulted both inside and outside of his house by a man wearing a gray hooded sweatshirt. F.S. testified that Demmings looks like the man in the gray hooded sweatshirt. Parker owns a gray hooded sweatshirt that Demmings frequently wore. While outside, F.S. heard a woman's voice. He did not see the woman, but thought the voice sounded like Parker's. The man in the sweatshirt forcefully brought F.S. inside the home where he again assaulted him. F.S. saw only this man enter the house. When F.S. regained consciousness, the lock box was gone. Two distinct sets of foreign footprints were found near F.S.'s house. One set was only located where the suspect's vehicle had been parked. The other set was found near the parked vehicle and also leading up to F.S.'s house. One of the prints in the set leading up to F.S.'s house contained blood.

Demmings could not be excluded as a contributor to the DNA mixture in a glove found at the scene, and was the predominant DNA profile in a matching glove provided to police by Parker. Shortly after the lock box was stolen, E.W. saw Demmings with a large wad of cash. On November 13, Demmings gave Parker a sock containing $7,430. Demmings changed the tires on his car on November 8 or 9, and told E.W. that the police would never find them because "they were long gone probably somewhere in Mexico."

On this record, the circumstances proved are inconsistent with the hypothesis that one man assaulted F.S. while another committed the theft. As discussed above, the jury heard and plainly rejected evidence supporting this hypothesis. The circumstances proved

only place one individual inside of F.S.'s home. The man who assaulted F.S. brought him inside the home, and when F.S. regained consciousness after being knocked out the man and lock box were both gone. The only foreign footprint found leading up to the house contained blood. F.S. was bleeding profusely during the assault; the only rational conclusion is the foreign footprint containing blood belonged to the individual who assaulted F.S. The circumstances proved simply do not support Demmings's assertion that one individual assaulted F.S. while another committed the theft.

Nor are we persuaded that the evidence is insufficient because the physical description F.S. gave to the police is inconsistent with Demmings's appearance. As noted above, we must assume the jury rejected inconsistent facts and circumstances favorable to the defense. *Silvernail*, 831 N.W.2d at 599. Therefore, the inconsistent description given by F.S. is not part of the circumstances proved. The relevant circumstances proved include that F.S. was assaulted by a man wearing a gray hooded sweatshirt, that Parker owns a gray hooded sweatshirt that Demmings frequently wore, and that F.S. testified that Demmings looked like the man in the gray hooded sweatshirt. On this record, the evidence was sufficient to establish that Demmings was the man who assaulted F.S. and took the lock box.

### B. Parker's accomplice testimony was sufficiently corroborated.

Accomplice testimony is inherently suspect. *State v. Jackson*, 746 N.W.2d 894, 898 (Minn. 2008). Accordingly, it is not sufficient to sustain a conviction, "unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Minn. Stat. § 634.04 (2012). Corroborating evidence need not establish a

8

prima facie case of the defendant's guilt, *State v. Adams*, 295 N.W.2d 527, 533 (Minn. 1980), or address each element of the crime. *State v. Lemire*, 315 N.W.2d 606, 610 (Minn. 1982). Rather, the corroborating evidence must be "weighty enough to restore confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial way." *State v. Hooper*, 620 N.W.2d 31, 39 (Minn. 2000) (quotation omitted). Corroborating evidence may consist of physical evidence associated with the crime, inadequacies in a defendant's testimony, and suspicious and unexplained conduct of an accused before or after the crime. *State v. Pederson*, 614 N.W.2d 724, 732 (Minn. 2000).

At trial, Parker provided the following testimony. She met Demmings approximately two months before the November 7 incident. Demmings moved into her apartment shortly after they met because he was homeless. On the night in question, Demmings asked her to go outside and start the Trail Blazer. He and another man then left the apartment. He returned home later that night. The next day, Parker saw Demmings with a large amount of money. On November 8 or 9, Demmings had the tires on the Trail Blazer changed and dropped the old tires off at his cousin's house. On November 13, Demmings gave her a sock containing a large amount of money. She saw him with three different socks full of money. Finally, Parker connected Demmings to various items found at the scene. She had seen him wearing gloves similar to those found at the scene, the knife the police discovered belonged to her, and the blue nylon rope had been used as a makeshift dog leash for Demmings's dogs.

9

Demmings argues that Parker's testimony was not sufficiently corroborated. We disagree. E.W. testified that she saw Demmings in the middle of November with a wad of cash that was so large that he could barely remove it from his pocket. E.W. found it unusual for Demmings to have such a large amount of cash. And Demmings told E.W. that the police had been to his cousin's home searching for tires, but "they were long gone probably somewhere in Mexico." Suspicious conduct after the crime can corroborate accomplice testimony. *Id.*

There was also physical evidence linking Demmings to the crime scene. Testing of the inside of the left-handed glove found at the scene revealed a DNA profile showing a mixture of three or more individuals. Approximately 99.99% percent of the general population could be excluded from the mixture, but neither Demmings nor Parker could be. The matching right-handed glove turned in by Parker was also tested. There was a predominant male DNA profile that was matched to Demmings, and Parker could not be excluded as a minor contributor. The blue nylon rope was used as a makeshift dog leash for Demmings's dogs. Finally, F.S. corroborated Parker's testimony that she knew about the lock box. On this record, we conclude that Parker's testimony was sufficiently corroborated.

## II.     The district court did not plainly err when instructing the jury.

District courts are afforded "considerable latitude" in the selection of language for jury instructions. *State v. Baird*, 654 N.W.2d 105, 113 (Minn. 2002). "[J]ury instructions must be viewed in their entirety to determine whether they fairly and adequately explained the law of the case." *State v. Flores*, 418 N.W.2d 150, 155 (Minn. 1988). An instruction

10

is erroneous if it materially misstates the law. *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001).

The district court instructed the jury that to find Demmings guilty of first-degree burglary it had to find that he (1) entered a building without consent, (2) assaulted a person in the building or on the building's appurtenant property, (3) committed the crime of theft while in the building, and (4) that the conduct occurred on or about November 7, 2013, in Anoka County.

Demmings argues that the district court erred by not including the elements of the underlying crime of theft. Because Demmings did not object to the instructions, we will reverse only if the district court (1) committed an error; (2) that was plain; (3) that affected the defendant's substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Montanaro v. State*, 802 N.W.2d 726, 732 (Minn. 2011). Demmings cites *State v. Charles*, 634 N.W.2d 425, 431 (Minn. App. 2001), to support his argument that the district court was required to instruct the jury on all of the elements of the underlying crime. We are not persuaded.

In *State v. Davis*, our supreme court held that it is not necessary to include the legal definition of theft when giving instructions on the elements of burglary. 864 N.W.2d 171, 177 (Minn. 2015). The supreme court observed that "detailed definitions of the elements [of] the crime need not be given in the jury instructions if the instructions do not mislead the jury or allow it to speculate over the meaning of the elements." *Id.* (quotation omitted). It concluded that "the district court's omission of the legal definition of theft from its jury

11

instructions on burglary . . . was not an error, much less a plain error that affected [the defendant's] substantial rights." *Id.*

Likewise, we conclude the district court's omission of the elements of theft does not constitute plain error. The jury was instructed that to convict Demmings of first-degree burglary it had to find that he (1) entered a building without consent, (2) assaulted a person in the building, (3) committed the crime of theft while in the building, and (4) that the conduct occurred on or about November 7, 2013, in Anoka County. Only one item, the lock box, was reported stolen. Given this fact, it was clear that Demmings was being accused of taking the lock box. And in its first-degree aggravated-robbery instruction, the district court told the jury that in order to find Demmings guilty, it must find that he "took property from a person or in the person's presence knowing that the defendant was not entitled to take it." This is consistent with the definition of theft. Minn. Stat. § 609.52, subd. 2(a)(1) (2012). Because the instructions were not misleading and did not allow the jury to speculate on the elements of the burglary offense, the district court did not plainly err and Demmings is not entitled to relief on this basis.

**Affirmed.**